In the Matter of the Estate of HANNAH LYNCH, Deceased.

Surrogate's Court, New York County, January 10, 1935.

*Joseph A. Cox*, for the public administrator.

*Leo T. McCauley*, Consul General of the Irish Free State in New York city, in person.

*Blum & Jolles* [*Joseph Blum* of counsel], for the Polish Consul General in New York city, intervening as *amicus curiæ*.

*George O. Arkin*, for Henry Gordon.

FOLEY, S. The immediate application here is a motion to resettle a decree in an accounting proceeding of the public administrator and to strike out the appearance of Leo T. McCauley, Consul General of the Irish Free State. The applicant is one Henry Gordon, who claims to act under a power of attorney obtained from five distributees resident in the Irish Free State.

The broader phase of the proceeding, as developed by the evidence, involves the business methods of Gordon, his solicitation of beneficiaries of estates, the procurement of agreements of compensation and the invalidity of powers of attorney obtained by him from such beneficiaries.

The decree sought to be resettled directed distribution to the next of kin and provided that fifteen per cent of their shares should be paid to Gordon, as their attorney in fact, and that the balance of their shares should be transmitted through the Consul General of the Irish Free State to the distributees residing in Ireland. Gordon, through his attorney, George O. Arkin, applies here to strike out the appearance of the Consul General and seeks a modification of the provision authorizing the latter to transmit. Gordon demands that the transmission of the funds to the foreign heirs be made through him as agent. The public administrator and the Consul General have appeared in opposition to this motion and

ask for counter-relief in the settlement of the decree by striking out the provision for the payment of the fifteen per cent of the shares to Gordon upon the ground that the power of attorney and the agreement under which he was employed were illegal, void and contrary to public policy. They contend that Gordon, although never admitted to practice as an attorney in this State, has been practicing law and has been engaged in the business of soliciting employment for lawyers and furnishing attorneys or counsel to render legal services in violation of the provisions of section 270 of the Penal Law.

Specifically they contend that the power of attorney in this estate is illegal because its terms permitted Gordon to furnish attorneys and counsel; furthermore, that the agreement fixed the compensation of Gordon and that out of his compensation he was required to pay " all legal and other expenses, charges, fees, advances and commissions." Generally, it is charged that the power of attorney in this estate was void because it was part of an illegal business conducted by him. It is asserted that this power of attorney is typical of numerous other powers of attorney of similar import which show that Gordon was engaged in the business of retaining and furnishing attorneys and counsel to render legal services and that he participated in compensation for services of a legal nature in contravention of the statutes and public policy of our State.

Testimony was taken by the surrogate which has revealed the methods of business conducted by Gordon over a period of years.

It appears from this evidence that Gordon was admitted to practice law in the State of Georgia. He had taken a law course in a correspondence law school in Kansas. In 1924 he came to New York State and made inquiries from the Board of Law Examiners as to the requisite qualifications to secure admission to the bar. He served a clerkship in a law office. He was ineligible to secure admission on motion because of the fact that he had not practiced in the highest court of the State of Georgia for a period of five years. He never became eligible to take his examination for admission to the bar. About the year 1925 he became associated with one Joseph Woerndle. The latter conducted a business under the corporate name of the Transatlantic Estates and Credit Company. Agents for the corporation solicited legatees and next of kin in estates for authority to represent them. Powers of attorney were procured from such persons which ran to Woerndle and/or the Transatlantic Estates and Credit Company. In most cases the names and addresses of the legatees or next of kin were disclosed in the records of the various Surrogates' Courts, in the petition for

the probate of the will or in the application for letters of administration. Written agreements for the compensation of the attorney in fact were also procured in varying percentages of the amount to be collected. In certain estates the compensation was as high as fifty per cent of the share of the beneficiary in the estate. Like Gordon, Woerndle was a disappointed applicant for admission to the bar in this State. It appears that Woerndle had practiced law in the State of Oregon for some years. He sought admission to the bar of New York State. Four applications made by him for admission were denied by the Appellate Division, First Department. The operations of the Transatlantic Estates and Credit Company and of Joseph Woerndle are considered in my decision in *Matter of Wellington* (154 Misc. 271).

In 1931 Gordon left his employer and started in business for himself of the same general character under the trade name " The Foreign Estates and Research Company." He testified that it was his custom either by himself or by his employees to examine petitions in probate and administration as soon as possible after they were filed for the purpose of ascertaining the names and addresses of legatees and beneficiaries in foreign countries. In addition to searches of the records of the courts, similar information was obtained from the daily newspapers published in this city. He had selected correspondents in England, Germany, Italy, France, Ireland and other countries. As soon as he ascertained the name of a prospective beneficiary of an estate, his practice was to cable his correspondent abroad. That correspondent immediately solicited the beneficiary and obtained an agreement to represent him on the basis of a percentage of the legacy or share. A power of attorney to Gordon was obtained from the beneficiary. Immediately upon notification of the execution of the so-called retainer, Gordon employed an attorney at law in New York to represent him in the administration of the estate. The compensation fixed in the agreements obtained by Gordon from the beneficiaries ranged from ten per cent to fifty per cent of the legacy or intestate share. This amount was divided in some cases one-third to the foreign correspondent and two-thirds to Gordon. In other cases the agreement was for an equal share to each. Gordon testified that he was required to pay out of his share the compensation of the attorney in New York State. It has been established by the official records of this court and by the admissions of Gordon that his solicitation and representation of foreign heirs has been extensive. In the past few years he has secured agreements and powers of attorney in approximately one hundred and ten estates in the Surrogates' Courts of New York, Kings, Westchester, Queens and Bronx counties.

In the present estate the correspondent of Gordon in Ireland who procured the power was a Miss J. Levonton of Dublin. She has also acted in many estates for the Transatlantic Estates and Credit Company.

The system of soliciting known heirs or known legatees in estates has been the subject of complaint by the Consuls of the various countries in New York and by reputable attorneys representing executors and administrators. It is charged that beneficiaries, who would have received their shares of estates in the ordinary course and without any deduction for attorney's fees or for the compensation of solicitors, have been imposed upon by foreign agents to sign unconscionable and exorbitant agreements to pay, and to execute accompanying powers of attorney. Cases have arisen, where foreign legatees or heirs, who would have received their shares in the full amount, have been led into signing agreements to pay as high as fifty per cent of the money due them. It is also charged that the foreign solicitors deduct an amount in excess of the agreed compensation. It is claimed that there has been delay in transmission and payment and that in some cases there has been embezzlement of the moneys. It is asserted that the foreign agent in Poland of a New York company converted over $100,000. Certainly such a system should not be tolerated in probate courts under their policy to protect beneficiaries of estates from imposition or unnecessary expense.

In the pending proceeding before me certain estates have been submitted to me as typical examples of the operation of Gordon and the detrimental result of his methods. In the estate of Catherine Ward, a Christian brother reported to the public administrator the death of his sister in New York county and delivered the savings bank books as assets of the estate. He furnished the names of his sister's next of kin, who were a father and mother, residents of Ireland. He also supplied their addresses there. The public administrator thereupon applied for letters of administration. His petition for letters disclosed the names and addresses of the parents. Gordon discovered these facts and immediately cabled to his correspondent in Ireland, who, within a few days, obtained an agreement for compensation for his services and a power of attorney from the parents. The case was reported to the Irish Free State government and the power of attorney was subsequently revoked. In another estate a British subject died in New York leaving a widow and three infant children residents of Pitcairn Island, one of the British possessions in the Pacific. An agreement and power of attorney was obtained by Gordon from the widow. Subsequently the power was revoked. The British Consul General

in New York had already appeared on behalf of the widow and children. In another estate there were known next of kin in Germany. Similar efforts by Gordon resulted in his obtaining information from the records of this court as to the identity and location of such next of kin. He sought and secured the usual power of attorney and agreement for compensation. In many estates it has been disclosed that Gordon's expeditious method of solicitation by wireless and cable resulted in obtaining powers of attorney before the arrival of the ordinary mail notifying the legatee or next of kin of the death of his benefactor by will or the intestate relation. The value of the estates selected by Gordon were sizable and the returns from his operations were profitable.

It is also claimed that imposition was practiced by the solicitor in the foreign country upon the beneficiary in obtaining the agreement and power of attorney. There is evidence in the record before me to establish that fact. No honest disclosure of the status or interest of the beneficiary was made by the solicitor. Instead, the person abroad was informed that he might have a " claim " against an estate which the solicitor undertook to enforce and collect. In all of these cases the share of the next of kin or legatee was fixed by law or by the terms of the will. Almost without exception the beneficiaries are recognized by the executor, private administrator or public administrator and the collection of their share was simply a question of transmission by the representatives of the estate or his attorney, without any necessity for the services of an attorney in fact.

Gordon further testified that he selected a lawyer to represent him in the administration of the estate and judicial proceedings and turned over to him all work in connection with the estate. During the course of his individual operations he has availed himself of the services of approximately twelve attorneys. The work was parcelled out by Gordon to these lawyers. The provisions of the powers of attorney, which were used by him, authorized him to retain an attorney to appear and represent the foreign beneficiary. In certain cases the attorney was hired for an absolute amount which Gordon paid out of his share of the compensation fixed in the agreement. In other cases a percentage of the legacy or distributive share was paid to the attorney for his services, but even in these cases the percentage was paid by Gordon out of his fixed share of the compensation. In still other cases he divided equally with the attorney the compensation he received. It is clear from the evidence that the services to be rendered by Gordon, aside from the mere collection, contemplated the rendition of legal services exclusively. His own testimony supports this conclusion because he testified that he employed a lawyer in every estate

immediately upon his own retainer by the foreign beneficiary. It is clear also that the scheme of division of the fees was an unlawful participation by him in the practice of law.

It has been established to my satisfaction that he has made it a business " to furnish attorneys or counsel * * * to render legal services " in violation of law. (Penal Law, § 270; *People* v. *Meola*, 193 App. Div. 487.) The motive for his activities and his participation in this unauthorized practice is more apparent because of his failure to secure admission to practice law in this State.

In the last few months when Gordon's activities came under the criticism of the various foreign Consuls, he changed his method of doing business. He testified his new system is to cable abroad to his agent and to have inserted in the power of attorney before execution, the name of the New York lawyer whom he selects. This practice is even more reprehensible when judged either from his own activities or from the participation of the designated lawyer in such a scheme. It supports the conclusion that Gordon was directly engaged in furnishing attorneys to render purely legal services and that he contemplated a participation in their fees. The entire scope of Gordon's activities, as developed by the evidence, requires the condemnation of the court.

Upon all the evidence, I hold the power of attorney and the agreement of compensaton procured by him in the pending case were illegal and void *ab initio* and in their entirety. In a similar situation arising in the Surrogate's Court of Westchester county, where the agent — a person not a lawyer — obtained an agreement from a foreign heir to pay thirty-five per cent of the distributive share, Surrogate SLATER held that the agreement was void. His decision was not reported. It was affirmed without opinion by the Appellate Division, Second Department, in *Matter of Hess* (207 App. Div. 866). In that case the soliciting agent was one Jeremiah S. Perkins, who was subsequently convicted for embezzling the moneys of beneficiaries of estates which were collected by him as attorney in fact.

It should be noted that my observations in no way affect the status of an honest agent or attorney in fact of a foreign beneficiary of an estate. In many cases a relation in New York, or lawyer or a bank here, is employed by the direct authority of the foreign heir or his attorney in the foreign country to represent the beneficiary in a particular estate. No solicitation of the retainer is attempted. No general business of solicitation is carried on. Where an attorney is necessary to be retained in a particular estate a separate charge is made to the client either in this country or abroad for the reasonable value of the services rendered. There

is no illegal division of fees between the agent and the lawyer as in the case of Gordon's agreements.

The cross-application of the public administrator and the Consul General of the Irish Free State is granted. The decree may be resettled by providing for the transmission of the entire shares of the beneficiaries through the Consul General of the Irish Free State.

Submit resettled decree on notice accordingly.