**In re William TAYLOR Geraldine Biedzinski a/k/a Geraldine Taylor, Debtor.**

**Bankruptcy No. 85–01559DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 14, 1998.

Roger V. Ashodian, Delaware County Legal Assistance Ass'n, Inc., Chester, PA, for Debtors.

Michael Donahue, Community Legal Services, Inc., Philadelphia, PA, Prior Attorney for Debtors.

Michael Bickford, Oklahoma City, OK, for Ron B. Leppke of American Property Locators, Inc.

Ron B. Leppke, American Property Locators, Inc., Oklahoma City, OK, The Finder.

James J. O'Connell, Philadelphia, PA, Former Standing Chapter 13 Trustee.

Edward Sparkman, Philadelphia, PA, Present Standing Chapter 13 Trustee.

Michael R. Stiles, United States Attorney, Philadelphia, PA.

Virginia R. Powel, Assistant U.S. Attorney, Philadelphia, PA.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before us in the instant Chapter 13 bankruptcy case, which was closed on April 10, 1986, is an Application ("the Application") of Ron B. Leppke of American Property Locators, Inc. of Oklahoma City, Oklahoma, a self-proclaimed property finder ("the Finder"), to have this court pay to him $2,873.99 of unclaimed funds ("the Funds") held in this case which are payable to Co–Debtor WILLIAM TAYLOR ("the Debtor"). There is no issue with regard to the Debtor's right to the return of the Funds, but an issue has arisen as to whether the Finder is entitled to enforce an Unclaimed Property Agreement ("the Agreement") with the Debtor on the basis of which the Finder contends that he is entitled to retain fifty (50%) percent of the Funds.

We conclude, in response to the Finder's contrary arguments, that the Funds in issue are property of the Debtor's estate and that this court has the authority to regulate their disposition, including the Finder's entitlement to any portion thereof. This is particularly so because this fee is chargeable to the Debtor, and 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 2016 and 2017, under the caselaw of this court and this Circuit, impose upon us the power and duty to review the Finder's fees.

We have found no precedent in any reported cases regarding the regulation of the fees of finders of unclaimed bankruptcy funds. We therefore have considered the body of law regulating the fees of "heir hunters," which many states, including Pennsylvania, limit to ten (10%) percent of the unclaimed property. We have also considered the

Finder's failure to present evidence regarding the nature and extent of the services he performed, despite our specific request for same. Therefore, we will reduce the Finder's requested fee to ten (10%) percent of the Funds, or $287.40.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor and GERALDINE BIEDZINSKI, a/k/a Geraldine Taylor, described as the Debtor's "common law wife" at that time ("the Wife"; with the Debtor, "the Debtors"), filed a voluntary joint bankruptcy case under Chapter 7 of the Bankruptcy Code on April 22, 1995. This case was converted to a Chapter 13 case on July 17, 1985. A Chapter 13 plan was confirmed on October 16, 1985, and a discharge was entered on March 27, 1986. After the discharge, the Wife, for reasons as inexplicable as how the Funds came to be paid in over the course of a plan of such short duration and why they were not promptly refunded to the Debtors, moved to voluntarily dismiss the case as to her on April 8, 1986. Although a dismissal order was entered on April 8, 1986, it appears to us that this disposition would not revoke her discharge. See 11 U.S.C. § 1328(e). However, be that as it may, the case was closed on April 19, 1986, and it and the Funds passed into oblivion for over twelve (12) years.

At this juncture we should relate that, in late 1996, we discovered that this court was holding funds unclaimed by Chapter 13 debtors in about fifty (50) cases filed between 1986 and 1992. By the use of locator services available through Westlaw, we were able to find about half of these debtors and remit the funds due to them.

On August 22, 1997, the Finder filed the Application before us. Without making mention of the Wife, the Application invokes 11 U.S.C. § 347 and 28 U.S.C. § 2041 and requests that the Funds be paid to the Finder under the terms of a Limited Power of Attorney ("the Power") for the Debtor. The Application and a certification of service on the "United States Attorney" was executed by Leppke, who is not an attorney. The terms of any agreement between the Finder and the Debtors was not mentioned. The Clerk's

Office scheduled a hearing on the Application in the ordinary course for October 2, 1997.

Prior to and after the hearing, at which no interested party appeared, we did some investigation into the circumstances of the unclaimed funds in this case. As a result, we learned that, although we had believed that our 1996 project had identified all of the Chapter 13 debtors who had unclaimed funds remaining on deposit with this court, in fact many more such debtors existed in cases filed prior to 1986. We therefore commenced a new project to attempt to locate approximately 100 debtors reported as having more than $500 of their funds on deposit with this court as unclaimed funds to refund the money due to them. We have located and returned the funds due to about half of this group between November 1997 and the present and are still seeking to locate more of the debtors.

With respect to the Debtor in this case, we note our regret that the Finder located him before we did. We also noted the Wife's presence in the case and her apparent right to a share of the Funds. Although, recognizing the role of the Finder in bringing not only the Debtor but also this new group of unclaimed-fund-recipient-debtors to our attention, we entered an order of October 27, 1997, modelled upon an order entered in *In re George K. Heebner, Inc.*, Bankr. No. 81–02566S (Bankr.E.D.Pa. Nov. 9, 1990), *reconsideration denied* (Bankr.E.D.Pa. Nov. 21, 1990), *stay denied*, C.A. No. 90–0792 (E.D.Pa. Dec. 5, 1990), in which we directed the Finder to disclose

a. Compensation recoverable by the Applicant. Any contract with the Debtor(s) is to be attached.

b. Narrative explaining why the Debtor(s) did not receive the funds and efforts and approximate time expended by the Applicant to locate the Debtor(s).

This Order was formulated to require finders to establish their right to a recovery of the fee charged before releasing money to them on behalf of claimants. In the *Heebner* case the district court refused a finder's attempt to stay such an order. We also scheduled a hearing on the Application on November 20,

1997, inviting the Finder and his counsel, an attorney located in the same building as his business in Oklahoma City, to participate by telephone.

In response to our requests, on November 13, 1997, we received a report from the Finder in the form of a short letter, to which the Agreement and a waiver of any of the sum due to the Wife, signed by her, was attached. In the letter the Finder explained his services as follows:

Per my discussions with William Taylor, I was advised that the Taylors moved multiple times subsequent to the filing of the bankruptcy case. Mr. Taylor believes that these moves resulted in the funds not reaching the Taylors.

I do not tract [sic] the time expended on the parties/entities for those that are located and also those which are not located.

He also stated that only his attorney would participate in the hearing.

The Agreement provides in pertinent part as follows:

1. Property Locator has told the Owner that Owner may be entitled to claim money held by another and belonging to Owner (the "Unclaimed Funds"). The Owner wishes to have Property Locator make claim to the Unclaimed Funds on behalf of Owner. Any funds of Owner, not to exceed $3,000.00, that the holder has been unable to deliver are agreed by the parties to be subject to this Unclaimed Funds Agreement as Unclaimed Funds.

2. Property Locator shall pursue recovery of the Unclaimed Funds on behalf of Owner and shall receive as compensation for its efforts 50% of the Unclaimed Funds of Owner that Property Locator recovers on behalf of Owner. After locating and claiming the Unclaimed Funds on behalf of Owner, Property Locator shall pay to Owner 50% of the Unclaimed Funds and retain the other 50% as its compensation. Any costs incurred by Property Locator in pursuit of the Unclaimed Property shall be borne solely by Property Locator. Owner shall not be responsible for any amounts other than Property Locator's compensation described above and then only if Property Locator is successful in recovering the Unclaimed Funds. Owner agrees to execute or provide any documents necessary to recover the Unclaimed Funds.

3. Owner authorizes Property Locator to utilize a Limited Power of Attorney to claim the Unclaimed Funds on behalf of Debtor.

4. This Unclaimed Property Agreement may be terminated by Owner at any time after one year from the date below. This Unclaimed Property Agreement shall bind and inure to the benefit of the parties successors and assigns and shall be governed by Oklahoma law.

The November 20, 1997, hearing was continued until December 2, 1997, due to the failure, with the exception of the Debtor, of all of the several parties directed to do so to in fact appear, including the Trustee, the Wife, or the Debtors' counsel of record. On December 2, all the required parties did appear. The Finder appeared only through his attorney.

At the hearing, most of the testimony received into evidence came from the Debtor. He explained that, in August 1997, he received a letter from the Finder explaining that money of his had been found and that the Finder could recover it for him in exchange for his agreement to remit fifty (50%) percent of the amount recovered to the Finder. Accompanying the letter was the Agreement and the Power, and the letter requested the Debtor to sign these items and return them to the Finder along with proof of his identification. The letter indicated the approximate amount of the money by stating that the Debtor's share would be about $1,400. The letter did not state, however, where the money was located.

The Debtor signed the Agreement and the Power and sent them back to the Finder almost immediately. In the interim, the Debtor placed a call to the Finder who told him that it could take three to four months for the Funds to be recovered. The Finder did not, however, inform the Debtor of the location of the Funds, and the Debtor testified that he did not believe he was in a position to bargain with respect to the Finder's fee for his services.

The Debtor also testified that he was under the mistaken impression that Leppke was an attorney and that this belief was a factor which influenced him to sign the Agreement and Power. Upon reviewing the Power form provided for the Debtor to sign, this belief is understandable. In several locations on the Power, it identifies Leppke as being an "attorney-in-fact" and of holding the "power of attorney." Although these terms do not mean, of course, that Leppke is actually a lawyer, neither the Form, the cover letter, nor the Agreement explain what the terms mean or clarify that Leppke is not an attorney seeking to represent a prospective client's interests. To a lay person the language used in the power of attorney form was easily subject to the interpretation that he is an attorney.

The Wife also testified and explained that she did in fact renounce her claim to the Funds. Apparently she receives Supplemental Security Income disability benefits, and she is concerned that the receipt of any of the Funds might adversely affect her eligibility for same. The Debtors indicated they there were no longer living together, but were on amicable terms, and it seemed likely that the Debtor would informally share the Funds with the Wife. In any event, the Wife testified that she knowingly signed the letter presented to her by Leppke which waived her claim to the Funds.

Following the hearing, we entered an order immediately refunding half of the Funds, $1,436.99, to the Debtor. We retained the balance while the parties were invited to submit briefs addressing any pertinent issue, particularly the issue raised most prominently by the Finder, *i.e.*, this court's authority to regulate the Finder's fee. The Finder's counsel also agreed to submit copies of Local Rules of any courts addressing the subject of applications by locators of unclaimed funds, as he expressed significant general knowledge of same. The Finder's submission was due and was timely received on December 15, 1997. The submission from the Debtor's counsel, a substitute for the Debtors' original legal services attorney, was due by December 31, 1997, but was not received until January 2, 1998.

## C. DISCUSSION

1. *This Court Has the Jurisdictional Power and Duty to Determine the Finder's Right to Compensation for the Services Which It Provided to the Debtors.*

The Finder's principal argument is that this court lacks jurisdiction to consider its right to compensation. The Finder begins by accurately quoting the law pursuant to which the Funds were received into this court, 11 U.S.C. § 347(a), which provides as follows:

(a) Ninety days after the final distribution under section...1326 of this title in a case under chapter...13 of this title, ...the trustee shall stop payment on any check remaining unpaid, and any remaining property of the estate shall be paid into the court and disposed of under Chapter 129 of title 28.

He next references the two sections of Chapter 129 of title 28 which are potentially relevant, 28 U.S.C. §§ 2041, 2042, which state as follows:

**§ 2041. Deposit of moneys in pending or adjudicated cases.**

All moneys paid into any court of the United States, or received by the officers thereof, in any case pending or adjudicated in such court, shall be forthwith deposited with the Treasurer of the United States or a designated depositary, in the name and the credit of such court.

This section shall not prevent the delivery of any such money to the rightful owners upon security, according to the agreement of the parties, under the direction of the court.

**§ 2042. Withdrawal**

No money deposited under section 2041 of this title shall be withdrawn except by order of the court.

In every case in which the right to withdraw money deposited in court under section 2041 has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in

the Treasury in the name and to the credit of the United States. Any claimant entitled to any such money may, on petition to the court and upon notice to the United states attorney and full proof of the right thereto, obtain an order directing payment to him.

■ The Finder argues that the distribution of the Funds has no effect on the Debtors' estate because administration of this estate was completed when the case was closed in 1986. We disagree with this assertion. The Funds, having been paid by the Debtors to the Standing Chapter 13 Trustee account during the pendency of this case, clearly were property of the Debtors' estate pursuant to 11 U.S.C. §§ 541(a)(4), (a)(7), and 1306(a).

We would point out that the very fact that Funds are on account and are payable to the Debtors renders such funds property of the Debtors' estate. Distribution of funds, moreover, is one of the essential functions of administration of bankruptcy estates by bankruptcy courts. It is for this reason that the Application invokes 28 U.S.C. §§ 2041 and 2042. If the court, as it does, has jurisdiction to order the delivery of the Funds to the Finder or the Debtor, surely it must also have jurisdiction to administer the Funds as property of the Debtors' estate. It would also appear to follow logically that this court must have jurisdiction to analyze issues related to the question of to whom the Funds should rightly be paid.

■ Consideration of the Application therefore certainly appears to be within this court's subject matter jurisdiction, as the Finder concedes by filing it here. Congress granted jurisdiction to the bankruptcy courts over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). This section gives bankruptcy courts jurisdiction over three separate categories of proceedings: (1) civil proceedings and contested matters arising under title 11; (2) such civil matters arising in cases under title 11; and (3) civil matters related to cases under title 11. See, e.g., Donaldson v. Bernstein, 104 F.3d 547, 553 (3d Cir.1997); and In re Marcus Hook Development Park, Inc., 943 F.2d 261, 264

(3d Cir.1991). The first category of jurisdiction references proceedings in which the right to relief is based directly upon a provision of the Bankruptcy code. See generally In re Hanks, 182 B.R. 930, 935 (Bankr. N.D.Ga.1995); In re GWF Investment, Ltd., 85 B.R. 771, 775 (Bankr.S.D.Ohio 1988). See also In re National Gypsum Co., 118 F.3d 1056, 1063–64 (5th Cir.1997) (stating that a proceeding to enforce the discharge injunction under 11 U.S.C. § 524 arises directly under the Bankruptcy Code and as such is the subject of bankruptcy court jurisdiction); and In re Winebrenner, 170 B.R. 878, 881 (Bankr.E.D.Va.1994) (holding that court retains jurisdiction to hear proceedings arising under title 11). The second category described types of matters that tend to arise in bankruptcy cases, but which do not necessarily involve the adjudication of substantive rights under the Bankruptcy Code. See GWF, supra, 85 B.R. at 775. The third and final category for matters, those "related to" bankruptcy cases, covers actions which may affect a debtor or the bankruptcy estate but are normally based on nonbankruptcy law. See Donaldson, supra, 104 F.3d at 552–53; Marcus Hook, supra, 943 F.2d at 264; In re Wood, 825 F.2d 90, 93 (5th Cir.1987); and GWF, supra, 85 B.R. at 775.

■ The instant matter rather clearly fits within the first jurisdictional category, since it arises under 11 U.S.C. § 347(a). If it were necessary to reach the issue, it could be held to fit within the second or third categories as well. We therefore conclude that jurisdiction exists to hear and determine the Finder's Application for release of the Debtors' funds.

We do note that the Debtors' case is closed at present, although this fact is not mentioned by the Finder. Perhaps this is because it is recognized, as an administrative policy, that bankruptcy cases need not be reopened to determine applications or motions to distribute unclaimed funds to (usually) creditors or debtors.

■ However, the fact that a case is or is not closed merely relates to its administrative status, which does not affect a bankruptcy court's jurisdiction to determine matters relevant to the case. See In re Statistical

*Tabulating Corp.*, 60 F.3d 1286, 1289–90 (7th Cir.1995), *cert. denied sub nom. LaSalle Bank Lake View v. United States,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996); and *In re Germaine,* 152 B.R. 619, 624 (9th Cir. BAP 1993). A matter over which a bankruptcy court has jurisdiction can be considered by that court even if the case is closed. *See Koehler v. Grant,* 213 B.R. 567, 569–70 (8th Cir. BAP 1997). Usually, it is required that a closed case be reopened after notice to all interested parties before a bankruptcy court will decide a matter in that case, in order that all interested parties are notified of the matter at issue. Dispensing with this requirement administratively with respect to distribution of unclaimed funds is probably simply a recognition that such matters usually concern only the claimant and the court, although the better practice would appear to be to require notification to at least the case trustee and the United States Trustee to allow those parties to argue that the distribution is inappropriate or that broader notice is appropriate.

■ We could, at this point, reopen the Debtors' bankruptcy case *sua sponte* if necessary. *Donaldson, supra,* 104 F.3d at 552. The Code, at 11 U.S.C. § 350(b), permits a case to be reopened to administer assets of the estate, grant relief to a debtor, or for other good cause. *See also* F.R.B.P. 5010. We are herein administering assets of the estate, as we are in any order allowing unclaimed funds to be distributed. However, we perceive no adverse impact on any other party interested in this case as a result of our disposition of the Application, and therefore we are inclined to decide it without formally reopening this case at this juncture. We therefore conclude that jurisdiction of this court exists to hear and determine the Finder's application for release of the Debtors' unclaimed funds even though this case is not reopened.

2. *This Court Has the Power and Duty to Regulate the Finder's Compensation.*

■ The Finder's second argument is that, even if this court has jurisdiction to generally administer the process of distribution of unclaimed funds, it has no authority to regulate or modify the terms of the parties' Agreement as to its contracted fees. The Finder points out that no Bankruptcy Code section addresses the bankruptcy court's regulation of finders. It further argues that 11 U.S.C. § 327 applies only to a *trustee's* employment of professional persons and that 11 U.S.C. § 329 refers only to a debtor's transactions with *attorneys.*

It is true that § 327 does not appear to require the appointment of professionals employed by a debtor, either in Chapter 13 cases, *see In re Fricker,* 131 B.R. 932, 939–41 (Bankr.E.D.Pa.1991), or in Chapter 7 cases. *See In re Trinsey,* 115 B.R. 828, 831–32 (Bankr.E.D.Pa.1990). However, § 329 and F.R.B.P. 2016 and 2017 specifically provide that the compensation of a debtor's attorney is subject to court scrutiny. *See Fricker, supra,* 131 B.R. at 938–41.

Furthermore, although § 329 refers specifically to attorneys, F.R.B.P. 2016(a) applies to any "entity seeking interim or final compensation for services, or reimbursement of necessary expenses." As a result, in several recent decisions, this court has pointed out, *e.g., In re Gavin,* 181 B.R. 814, 820 (Bankr. E.D.Pa.), *adopted,* 184 B.R. 670 (E.D.Pa. 1995),

> that 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 2016 and 2017 applied to all parties charging for services in bankruptcy cases, and was not confined to attorneys. *See, e.g., In re Fleet,* 95 B.R. 319, 337–38 (E.D.Pa.1989); and *In re Evans,* 153 B.R. 960, 966 (Bankr. E.D.Pa.1993).

*See also In re Campanella,* 207 B.R. 435, 443 (Bankr.E.D.Pa.1997), referencing

> "[t]he considerable body of caselaw holding that it is highly proper for this court to regulate the practices and compensation of lay advocates as well as attorneys who practice before it pursuant to 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure 2016 and 2017. *See In re Fleet,* 95 B.R. 319, 337–38 (E.D.Pa.1989) (FULLAM, J.) (*"Fleet I"*). *Accord, In re Glad,* 98 B.R. 976, 977 (9th Cir. BAP 1989); *In re Harris,* 152 B.R. 440, 446–47 (Bankr. W.D.Pa.1993); *In re Minchew,* 150 B.R. 275, 277 (Bankr.N.D.Fla.1992); *In re Her-*

*ren,* 138 B.R. 989, 995–96 (Bankr.D.Wyo. 1992); *In re Webster,* 120 B.R. 111, 114 (Bankr.E.D.Wis.1990); and *In re Bachmann,* 113 B.R. 769, 774–75 (Bankr. S.D.Fla.1990)."

*Evans, supra,* 153 B.R. at 966.

Although finders are not specifically referenced in the Code or Rules, we can perceive no reason why they should be distinguished from all other sorts of lay advocates who purport to assist debtors, often for considerable compensation. Until the enactment of 11 U.S.C. § 110, lay advocates were not referenced in the Code either. *But see Evans, supra,* 153 B.R. at 966. As we noted in *Fricker, supra,* 131 B.R. at 939–41, the lack of necessity for court appointment heightens rather than diminishes the need for court supervision over the compensation process.

Moreover, since property finders, like other lay advocates, are unlicenced, their services and the charges imposed by them should be, if anything, scrutinized by this court even more carefully than those of lawyers, who are subject to licencing and ethical rules. *See Fleet, supra,* 95 B.R. at 338; and *In re Telford,* 36 B.R. 92, 94 (9th Cir. BAP 1984). Because of this distinction between lawyers and laypersons, some courts, in reviewing the rights of lay advocates, focus their inquiries primary on whether the lay advocates' services were legal in nature and amounted to the unauthorized practice of law. *See Telford, supra,* 36 B.R. at 94; and *In re Robinson,* 162 B.R. 319 (Bankr.D.Kan. 1993). This court, however, has been less concerned with whether lay advocates are engaging in unauthorized practice than whether such parties are profiteering by charging fees clearly in excess of the value of their services. *See Campanella, supra,* 207 B.R. at 450; and *Evans, supra,* 153 B.R. at 967–72.

 Finally, as the Finder acknowledges in a footnote in his brief and we indicate at some length in our discussion regarding the appropriate measure of the Finder's compensation, at pages 21–29 *infra,* courts have consistently reviewed the compensation properly payable to finders of heirs of decedent estates, colloquially referenced as "heir hunters." Our Court of Appeals made clear, in *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 840–45 (3d Cir.1994), that, in considering requests for compensation, bankruptcy courts have both the power and duty to assess such requests *sua sponte,* even in the absence of any objections by any interested parties, in the name of preserving the integrity of the bankruptcy process. We therefore consider it within both our power and range of duties to review the compensation payable to the Finder for the services performed in connection with the Debtors' bankruptcy case. Specifically, we have the power and duty to determine whether the Finder's demand for fifty (50%) percent of the Funds to which the Debtors may have a right is reasonable under all of the attendant circumstances.

These principles may be applicable to finders' practices as to any of their customers, including, more commonly, creditors. All finders' contracts would appear subject to the jurisdiction of bankruptcy courts to review and regulate. However, § 329 and F.R.B.P. 2016 and 2017, which apply only to debtors, make it abundantly clear that debtors' dealings with finders are particularly susceptible to review and regulation.

3. *The Amount of the Finder's Compensation Will be Limited to Ten (10%) Percent of the Funds at Issue, or $287.40, in This Case.*

a. *The Finder's Contract Is Analogous to Those of Heir Hunters.*

The Finder asserts that the Agreement is a binding contract, knowingly agreed to and invulnerable to attack despite the revelation that the Debtors could have been recipients of the Funds, without any allowance for the Finder's compensation, under the court's own program to locate Chapter 13 debtors having unclaimed funds on account. The court itself recognized the analogy of the Finder to the Pied Piper, who seemingly effortlessly did what had not been previously accomplished in over twelve years, and now seeks to be paid his previously-agreed compensation. However, although the issue of the proper compensation of finders appears to have evaded bankruptcy court review, the Agree-

ment is, in substance and effect, very similar to the types of contracts employed by "heir hunters," whose contracts have on many occasions been held to be unenforceable by numerous courts. Since this court has the power to regulate the Finder's fees, we can and will subject the Finder's fee demand to scrutiny.

An heir hunter is a another type of property finder who searches for individuals entitled to receive a payment from a decedent's estate. Heir hunters search probate, as opposed to bankruptcy court, records to attempt to locate open estates in which there are missing heirs. *See Carey v. Thieme*, 2 N.J.Super. 458, 464–65, 64 A.2d 394, 398 (1949); *In re Butler's Estate*, 29 Cal.2d 644, 647, 177 P.2d 16, 18 (1947); and A. Friedman, *Heir–Hunting Agreements: Recommendations for the Extension of Probate Court Jurisdiction*, 6 CONN. PROB. L.J. 87, 88–91 (1991) ("Friedman"). They then locate the heirs; in a mode of operation very similar to the instant Finder's, inform them of the money; and request the heir to execute a contract and power of attorney in their favor. *Carey, supra*, 2 N.J.Super. at 464–65, 64 A.2d at 398; *Butler's Estate, supra*, 29 Cal.2d at 647, 177 P.2d at 18; and *Friedman, supra*, 6 CONN. PROB. L.J. at 88–91. They do not, of course, reveal the source of the money to the heir, but instead use their exclusive possession of this knowledge as leverage to obtain a large fee, normally in the form of a percentage of the recovery. *Carey, supra*, 2 N.J.Super. at 464–65, 64 A.2d at 398; *Butler's Estate, supra*, 29 Cal.2d at 647, 177 P.2d at 18; and Friedman, *supra*, 6 CONN. PROB. L.J. at 88–91.

Finders' contracts in this context have existed for many years and have very often met with hostility from the courts. *See Nelson v. McGoldrick*, 127 Wash.2d 124, 129, 896 P.2d 1258, 1261 (1995) (quoted by the Finder for its statement that the actions of an heir hunter, the conscionability of whose contract was remanded to the trial court for further consideration, did not violate a state law relating to property reported or paid to their State Department of Revenue because it was not so paid; this case is discussed in more detail at pages 27–28 *infra*); *Estate of At-kinson*, 7 Phila. Co. 106, 116 (Phila.Co.C.P.1981) (per Jamison, J.); R. Davis, Annot., *Heir–Hunting*, 171 A.L.R. 351 (1947) (observing that heir hunting contracts are generally looked upon "with great disfavor"); and Note, *Heir Hunting—A Profession or a Racket?*, 7 VAND. L. REV. 104 (1953).

Under one line of cases, heir hunters' contracts and powers of attorney forms have been declared void as the product of unauthorized practice of law. This was the result reached in *In re Lynch's Estate*, 154 Misc. 260, 276 N.Y.S. 939 (New York Co. Surr.Ct.1935). *Lynch* involved the practices of an heir hunter who would watch for probate cases involving foreign heirs. Upon finding such a case, he would solicit the foreign heirs to represent them in the probate case for a percentage of the amount collected. *Id.*, 154 Misc. at 263, 276 N.Y.S. at 942. The court noted that cases existed where heirs "have been led into signing agreements to pay as high as 50 percent of the money due them," 154 Misc. at 264, 276 N.Y.S. at 943, although the fees ranged from ten (10%) percent to fifty (50%) percent. *Id.*, 154 Misc. at 263, 276 N.Y.S. at 942. As part of the solicitation the heir hunter would have the legatee sign a power of attorney giving him full authority to represent the heir's interest, including the ability to hire and give direction to attorneys to appear in court. *Id.* The heir hunter did in fact hire attorneys under this authority whom he paid out of his share of the proceeds. *Id.*

Upon learning of these practices the court held that the heir hunter was himself engaging in the unauthorized practice of law by soliciting powers of attorney and then managing the heirs' cases. *Id.*, 154 Misc. at 266, 276 N.Y.S. at 944–45. Moreover, the court found the heir hunter was sharing his legal fees with the attorneys that he hired, since he and the attorneys were paid out of the same funds. *Id.*, 154 Misc. at 265–66, 276 N.Y.S. at 944–45. Based on these findings the court held that the compensation agreements together with the powers of attorney were void *ab initio* and completely unenforceable. *Id.*, 154 Misc. at 266, 276 N.Y.S. at 945.

Deciding a case with very similar facts the Supreme Court of California, in *Butler's Estate, supra,* followed the New York court's opinion in *Lynch.* In *Butler's Estate,* 29 Cal.2d at 650, 177 P.2d at 19, the heir hunter solicited prospective heirs to execute assignments and powers of attorney in which he agreed to

> "represent (them) in all proceedings whatsoever in the matter of the estate * * * and particularly * * * to petition for letters of administration or letters testamentary, to recognize, defend or contest wills * * * to institute, prosecute or defend suits and proceedings in law, equity or in probate, in any court or courts, to enter our and each of our appearances therein."

Upon reviewing these provisions the court held that the heir hunter was engaging in the unauthorized practice of law. *Id.,* 29 Cal.2d at 651, 177 P.2d at 20. Although, again, the heir hunter at issue did hire attorneys to make court appearances, this fact was deemed irrelevant to the court's finding because the heir hunter himself agreed to provide the legal services to the clients and hired and managed the attorneys handling the cases. *Id.* This conduct was thus held to be sufficient involvement in the practice of law by the heir hunter for the court to find him chargeable with unauthorized practice of law and hold that his contracts were unenforceable as against public policy. *Id.,* 29 Cal.2d at 652, 177 P.2d at 20–21. *Accord, Carey, supra;* and *In re Estate of Rice,* 24 O.O.2d 379, 193 N.E.2d 566 (1963). *Cf. Westmoreland County v. Rodgers,* 693 A.2d 996 (Pa.Cmwlth.1997) (lay person found to be engaging in unauthorized practice of law where he represented land owners in property assessment appeals under a limited power of attorney to act on their behalf and did all things necessary to effectuate the appeal including hiring lawyers).

Pennsylvania trial courts have also had occasion to invalidate assignments and powers of attorney obtained by heir hunters. *See Atkinson, supra,* 7 Phila. Co. Rpts. at 106; and *McIlwain's Estate,* 27 Pa. D & C. 619 (Phila.Co.C.P.1936). These courts relied heavily upon their findings of champerty and maintenance in the contracts, *i.e.,* an involvement by parties in litigation by agreeing to provide financing or some other service in exchange for the right to share in a plaintiff's recovery. *See also Ames v. Hillside Coal & Iron Co.,* 314 Pa. 267, 272–73, 171 A. 610, 612 (1934); and *Belfonte v. Miller,* 212 Pa.Super. 508, 511–12, 243 A.2d 150, 152 (1968). The *Atkinson* court, 7 Phila. Co. Rpts. at 122, also questioned the good faith and conscionability of the heir hunter's conduct in light of his withholding information from the heir as a means for compelling him to make the assignment. Nevertheless, the court held that the heir hunter would be allowed to receive some amount of recovery on a quantum meruit basis because the services he performed were of some value to the estate. *Id.* at 133.

In *Nelson, supra,* the Supreme Court of Washington recently held that an heir hunting agreement was potentially unconscionable based on the circumstances under which it was executed and the question of services that the heir hunter actually provided. The case reached the court on a reversal, by an intermediate appellate court, of an order granting a motion for summary judgment by the heirs which declared the contract in issue and its fifty (50%) percent fee unenforceable as a matter of law under the doctrine of unconscionability. *Nelson, supra,* 127 Wash.2d at 126–28, 896 P.2d at 1259–60. The court held that the contract was potentially unconscionable but that further evidence needed to be produced for such a ruling to stand. *Id.,* 127 Wash.2d at 136, 896 P.2d at 1264. It therefore remanded the case with instructions for the lower court to consider all of the facts surrounding the agreement. *Id.* In so doing, the court noted several facts which it believed had to be considered to reach a decision, *i.e.:* (1) the amount of effort actually expended by the heir hunter; (2) whether the heir would have been located without the heir hunter's involvement; (3) the parties' unequal knowledge of the facts at the time the contract was executed; and (4) the advice and counsel the heir received from third parties leading up to her decision to sign the heir hunter's contract. *Id.,* 127 Wash.2d at 133–36, 896 P.2d at 1263–64.

In *Landi v. Arkules*, 172 Ariz. 126, 835 P.2d 458 (App.1992), the court invalidated a finder's agreement by holding that the finder engaged in improper solicitation for an attorney and charged excessive fees. The holding with respect to the fees was based on the court's observation that the state's escheat law, which allowed finders to collect no more than thirty (30%) percent of the value of property recovered, expressed a policy generally applicable to finders' contracts, even though it was not specifically applicable to the contract at issue. *Landi, supra,* 172 Ariz. at 133–34, 835 P.2d at 465–66. Since the contract at issue called for a forty (40%) percent fee, the court held that the amount sought to be charged pursuant thereto was excessive. *Id.* In addition, the court found that the finder had engaged in "investigative services" without a licence to do so, as required by state law. *Id.,* 172 Ariz. at 133–34, 835 P.2d at 465–66. For all of these reasons the court declared the finder's contract to be against state policy and therefore unenforceable.

b. *The Limitations on Fees Chargeable by Heir Hunters, as well as the Lack of Evidence of the Extent of His Services, Results in Our Limiting the Finder's Fees to $289.40.*

 The instant Finder attached to its brief, at our request, administrative orders, guidelines, policy statements, and, in one instance, a local rule of the bankruptcy courts for the Central and Eastern Districts of California, the Southern District of Florida, and the Districts of Idaho and Nevada, respectively, which address procedures to be followed by parties applying for release of unclaimed funds. Most require disclosure of the presence of finders and their fees, but only the District of Nevada Rule, at LR 3011(a)(2), expressly provides for a limitation of fees, setting the maximum compensation at fifty (50%) percent of the claim sought to be recovered. These submissions support the general principle that the regulation of recovery of unclaimed funds is within the jurisdictional power of bankruptcy courts. The Nevada rule and the order in *Heebner, supra,* also support the principle that the amount of the fee recovered by a finder is within the court's power to regulate. How-

ever, none of the rules, including the seemingly high maximum recovery allowable in the Nevada court, provide any precedent to us in establishing what fee may be appropriately awarded to the instant Finder.

In this latter regard, we note that Pennsylvania's escheat law, which is applicable to property held by instrumentalities of the federal government for periods in excess of seven years, 72 P.S. § 1301.9, limits payments to property finders to ten (10%) percent of the amount recovered. 72 P.S. § 1301.11(h)(2). Moreover, under Pennsylvania's escheat law, finders' agreements are completely invalid with respect to property reported to the Commonwealth under the law for the first 24 months following the report. 72 P.S. § 1301.11(g). Thus, if the Debtors' property were subject to Pennsylvania state law and under the control of the Commonwealth, the most that the Finder could have collected from the Debtor would be ten (10%) percent of the Funds, assuming that we found the Agreement sufficiently valid to allow any fee.

The limitation of compensation of heir hunters is provided for in a Uniform Unclaimed Property Act, which several states have adopted, although the limitations of fees in the versions adopted by the various states range from ten (10%) percent to thirty (30%) percent. *Friedman, supra,* 6 CONN. PROB. L.J. at 107–10. The Finder advises us that a similar statutory restriction on heir hunters' fees has been enacted in Oklahoma, the law which the Agreement provides is to be controlling in its enforcement. The Oklahoma statute limits an heir hunter's fee to twenty-five (25%) percent of any recovery. OKLA. STAT. tit. 60, § 674.1.

Thus, contrary to the Finder's assertion that the validity of the Agreement's provision for the measure of its fees at fifty (50%) percent of the Funds is unassailable, these cases and the policy underlying the legislation referenced above indicate quite the opposite. Although there are instances in which heir hunters' contracts have been upheld in their entirety, *see, e.g., In re Estate of Croake,* 218 Ill.App.3d 124, 161 Ill.Dec. 209, 578 N.E.2d 567, *cert. denied,* 142 Ill.2d 654,

164 Ill.Dec. 916, 584 N.E.2d 128 (1991); *In re Estate of Katze–Miller*, 158 Wis.2d 559, 463 N.W.2d 853 (1990); and *Pelton v. Witcher*, 319 S.W.2d 400 (Tex.Civ.App.1958), such contracts are almost always subject to careful scrutiny. This scrutiny is justified in light of the inherent unfairness involved in finders' methods of solicitation of their business and fixing their fees. Rather than obtaining a fee based on the quality and quantity of work required to locate a missing person or to find lost property, finders set their fees by pressuring property owners to accept take-it-or-leave-it arrangements premised upon the finder's threat of withholding information about the property's location. At least one judge who reviewed a finder's agreement wrote that this practice was the equivalent of criminal extortion. *Nelson v. McGoldrick*, 73 Wash.App. 763, 778, 871 P.2d 177, 184 (1994), *rev'd, Nelson, supra* (Alexander, J., dis. op.).

The view that finders engage in the practice of law, and that therefore their work must be done by attorneys, is not irrational, especially since the Rules of Professional Conduct forbid fees from being set in the manner utilized by heir hunters. The Rules require lawyers to "explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation." *See* Pennsylvania Rule of Professional Conduct ("Pa. R.P.C.") 1.4(b). The Comment to that Rule explains that a lawyer may never withhold information about a claim for the lawyer's own benefit. *Id.* The Pa. R.P.C. thus prohibit an attorney with information about the location of assets from keeping the location a secret from its owner simply to increase the fee to be charged for the recovery. To the contrary, the amount a lawyer would be permitted to charge for such a task would be governed by Pa. R.P.C. 1.5, which prohibits an attorney from setting illegal or clearly excessive fees. This Rule requires, among other things, that legal fees be based on consideration of the time and labor required by the representation.

We do not consider any of the foregoing observations, nor the applicable Pennsylvania or Oklahoma statutes cited, to be directly applicable to our determination, under applicable federal law, of the proper fee for the Finder in this or any other case. They are cited, however, as a frame of reference to indicate how legislatures and courts have reacted in analogous circumstances. It is instructive to observe that fees of parties such as heir hunters, engaging in very similar businesses, have indeed been found quite vulnerable to attack and regulation under applicable law.

Based on the record developed in this case it is clear that the Finder provided some services to the Debtors. However, we note that much of the particular services may be classified as legal in nature, and may therefore be denied for that reason, *see Evans, supra*, 153 B.R. at 966, and that the fee proposed to be charged for the services is in excess of their reasonable value. *See id.* at 969–72. Since the Finder did not accept our invitation to offer evidence into the record regarding his activities, we know very little about the work he actually performed on behalf of the Debtors. It is evident that he must have performed some minimal amount of investigation which led to him discovering the presence of the Funds and then led him to locate the Debtor. We cannot characterize these services as having been performed with a high level of skill, however. First, the Finder (thankfully) apparently did not locate any of the other debtors whom this court has sought out and in many cases found, some of whom had unclaimed funds on account which approached those on account in the Debtors' case. Also, as to his investigation in the particular case of the Debtors, the Finder failed to ascertain that the Wife was a co-debtor in the case, likely to be entitled to half of the Funds.

Many of the facts cited as relevant in assessing unconscionability of a finder's contract by the court in *Nelson, supra, see* page 525 *supra*, appear to be in the Debtors' favor. The unsophisticated Debtor, without advice from counsel, entered into the contract with knowledge of facts unequal to that of Leppke and with the misunderstanding that Leppke was an attorney acting on his behalf and thus subject to ethical principles applicable to attorneys. The Debtor may well have been located without the Finder's intervention.

The Finder's services prominently included the filing of the Application to obtain the release of the Funds. The Application, although short, appeared adequate and in some respects accurate. A certification of service on "United States Attorney" was included and, although we would have preferred an identification of United States Attorney, Michael R. Stiles, Esquire, by name, the address was accurate. A copy of the Power was signed by the Debtor and accompanied by documents providing the Debtor's identification. The Application was therefore adequately prepared. However, because of its brevity, it does not appear to be a document that would have taken more than one hour to prepare and serve.

In sum, then, we know that the Finder performed an unknown quantity of investigation and spent about an hour preparing the Application for the release of the Funds. For this work, the Finder is seeking to collect $1,436.99. Without more evidence regarding the extent of the Finder's investigation, we find that this sum is clearly excessive. The Finder's attorney posits that one or more of the Finder's employees physically came to Philadelphia from Oklahoma to perform the investigation. However, he also admits that they were most probably investigating far more than one case during this junket. Assuming that Leppke, himself, as opposed to an employee, did come to Philadelphia, it is possible, if not probable, that the trip was only one stop in an investigation of a high number of potential property claims of all types and variety in several courts. Little time was probably spent giving individual attention to any one claim, such as that of the Debtors.

Moreover, the only activity of the Finder which it was necessary to do in Philadelphia appears to have been locating the unclaimed property. Additional research directed towards finding the persons to whom the property was associated could very well have been performed in the Finder's office in Oklahoma, by utilizing computerized data bases such as that provided by the Information America service available on Westlaw which we have used in chambers to locate debtor-claimants.

Of course, the absence of evidence leaves us guessing as to what the Finder actually did. The Finder had the burden of proving the propriety of his fee. We only know that he performed an unknown amount of investigation and possibly engaged in the unauthorized practice of law in preparing the Application and filing and serving same in this court, and that is all. We also note that an unauthorized practice of law defense is supported by the Debtor's testimony that he reasonably concluded that Leppke was an attorney.

The Finder's efforts were nevertheless of some benefit to the Debtors. However it did so, the Finder did uncover the existence of the unclaimed funds and located the Debtor. It therefore deserves some compensation for its services on a quantum merit basis. In determining the amount of this compensation we are in agreement with the court in *Landi, supra,* 172 Ariz. at 126, 835 P.2d at 458, that a state's unclaimed property or escheat laws may provide a useful guidepost in establishing the amount of compensation due on this basis.

Even if such laws are not directly applicable, the limitations on finders' fees which they express represent a pronouncement of legislative policy regarding a closely analogous factual setting which, in the absence of other pertinent law, is highly relevant. Thus, in accordance with Oklahoma law, the law governing the Agreement, we are inclined to set an outer limit on the Finder's fee of twenty-five (25%) percent. Nevertheless, due to the paucity of evidence which the Finder presented, we feel constrained to award him a recovery of only the comparable Pennsylvania outer limit of ten (10%) percent. This is also the measurement which the Debtor urges that we apply to the Finder's compensation in their brief. Without actual evidence of the breath of the Finder's investigative effort, any higher fee is unjustified. But, at $287.40, an award of ten (10%) percent of the Funds adequately compensates the Finder for the preparation of the Application and for some portion of his investigation.

## D. CONCLUSION

For all of the reasons set forth herein, this court will enter an Order awarding the Finder $287.40 of the $1,436.99 on account, and refunding the $1,149.59 balance to the Debtor.

### ORDER

AND NOW, this 14th day of January, 1998, after a telephonic hearing of December 2, 1997, on the Application for Order Directing Payment of Funds to Creditor/Claimant ("the Application") filed by Ron B. Leppke of American Property Locators, Inc. ("the Applicant") on behalf of the Debtors in this case, and upon consideration of the parties' respective post-hearing submissions, it is hereby ORDERED AND DECREED as follows:

1. The Application is GRANTED in part only.

2. The Clerk of this Court shall pay $287.40 of the unclaimed funds in the above-captioned case to the Finder.

3. The balance of the unclaimed funds of $1,149.59 shall be paid to Debtor William Taylor.