EVERS, J.T.C.
Plaintiffs have moved for an order directing the disposition of a certain fund created as a result of excess tax payments made by 13 condominium owners who are entitled to a refund of such payments but who cannot be located. The Borough of Cliffside Park (borough) claims that the fund should be paid to it while the Treasurer of the State of New Jersey (State) maintains that the monies should be paid to the Treasurer as custodian.
Plaintiffs are a part of a group of 325 condominium owners who lodged tax appeals with the Division of Tax Appeals, which appeals were subsequently transferred to the Tax Court.[1] All 325 taxpayers were represented by the same counsel and the matters were consolidated for purposes of trial. While the matters were not certified as a class action pursuant to R. 4:32-1 et seq., it was understood by the court and the parties *84 that the disposition of certain selected lead cases would be binding on all others of the group. In the event of a reduction in assessments, such reduction would be applied to each taxpayer on the basis of a formula agreed on between the parties. One appraisal expert was retained to represent all taxpayers.
Prior to trial, and following extensive negotiations, all 325 matters were settled. The settlement as to each taxpayer was documented and the entire agreement was placed on the record. Following the court’s questioning of all those participating in the settlement negotiations, including counsel, the experts and the appraiser, and based on representations of both counsel that they had complete authority to enter into such such settlement, an order was entered directing the Clerk of the Tax Court to enter judgments pursuant to the settlement. The judgments were entered.
In anticipation of the difficulty which counsel for the plaintiffs would encounter in attempting to locate all 325 taxpayers an order was entered directing plaintiffs’ counsel of the steps to be taken in his search.[2] Counsel was successful in locating 312 plaintiffs and, after deducting counsel fees, the appropriate refunds, which were calculated on the basis of the aforementioned formula, were made to each.[3] Despite what the court finds to be diligent and exhaustive efforts by counsel, 13 taxpayers who are entitled, after deduction of counsel fees, to the collective sum of $2,361.10 could not be located.[4] It is the distribution of that sum which is now in question.
*85 In addition to seeking such direction from the court, plaintiffs’ counsel requests an allowance of additional counsel fees attributable to his efforts in attempting to locate the 13 taxpayers and reimbursement of the cost of publication of newspaper notices, the latter sum being in the amount of $124.44. Borough claims that because the taxpayers cannot be found and, in all probability, would have been unavailable had the matters proceeded to trial, the settlements should be overturned and the sum of $2,361.10 plus counsel fees should be remitted to it.[5]
The State, based on the common law principles of escheat and N.J.S.A. 2A:37-30(a) which concerns the custodial taking of monies in similar situations, urges that the fund be paid to the Treasurer to be generally held as a custodial taking of unclaimed property and to be held subject to further claims by the parties entitled thereto or their successors. Plaintiffs’ counsel joins in that argument.
Reduced to its simplest terms, borough’s claim is that the monies represented by this fund, once they were paid as part of the tax payments, became municipal funds and remain so to this time. Had the matter proceeded to trial, doubtless (so argues borough), the complaints would have been dismissed for lack of prosecution. No reductions could have been granted and the monies never would have been disbursed. Thus, borough argues that the question of escheat need not even be addressed.
This argument, if followed to its logical conclusion, would have plaintiffs’ counsel remit the entire fund, including counsel fees, to the borough; the judgments entered pursuant to settlement vacated; the matters restored to the trial calendar and listed for trial, and the dismissal of those matters where the plaintiff-taxpayer fails to appear at trial. It is not illogical to assume, as to those plaintiffs who would appear at trial, that the matter would be settled in accordance with the formula applied to the other 312 taxpayers.
*86 This argument, in effect, would simply set aside the prior proceedings engaged in by both counsel, the witnesses and assessor, all of which the borough’s governing body was aware. In substance, the effect of this motion, if granted, would be to prolong the search already made and to enlarge upon the order, which resulted from an agreement between the parties, entered by the court almost six months ago. Furthermore, this argument completely overlooks the understanding of counsel and the court with regard to the management of the trial of these 325 matters wherein it was understood that the units would be grouped into various segments depending on size, floor and other such features, thereby obviating the need for testimony describing the details of each unit; and further, that the valuation testimony as to each group would be delivered by only one expert witness. This arrangement was agreed to with the goal of expediting the trial.[6] This agreement was not predicated on the presence or availability of the individual plaintiffs.
Additionally borough’s argument overlooks the nature of the debts which make up the fund. By virtue of the settlement— and it was the very essence of the settlement agreement — the borough expressly and impliedly acknowledged that the assessments exceeded the true value of the property; that the properties had been overvalued; that excess taxes had been paid. Put" another way, had the properties in the first instance been assessed at their agreed-on true value, the excess taxes never would have been paid and the borough never would have received, nor would it have been entitled to receive, these funds. In that posture, although whether the funds will ever be paid over to the 13 taxpayers is problematical, it is clear that borough has no claim thereto.
Lastly, given the circumstances leading to the creation of this fund, borough is estopped from now lodging a claim thereto. Borough was ably represented at every stage of every proceed *87 ing, including the long and arduous settlement negotiations and the placement of the terms and conditions of the final settlement on the record. In spite of the fact that hovering over these negotiations was always the spectre that each plaintiff entitled to a refund could not be located, the settlement and ensuing judgments were not conditioned on their availability to lay claim to the refunds. The settlement was based on the true value of the real estate and not on the location, whereabouts, availability or nonavailability of the owners of that real estate. The subject of counsel fees never entered into the settlement agreement.
The borough is not entitled to these monies. Equitable principles^ — fundamental fairness — dictate this conclusion.
The court is satisfied that the fund should be paid over to the State Treasurer, as urged by the Attorney General. It should be recognized that under the common law the State did have the right to take the property of an individual whose whereabouts was unknown. The basic common law conceptions were set forth by the Supreme Court in State v. Standard Oil Company, 5 N.J. 281, 74 A.2d 565 (1950):
In modern usage “escheat” signifies the falling of the property to the sovereign for want of an owner; and this category embraces not only property which has no other owner, but also property whose owner or whose owner’s whereabouts is unknown. Under the common law of England escheats came to be classified as “another branch of the King’s ordinary revenue.” What was originally an incident of tenure is now an incident of sovereignty. The doctrine of escheat, at the early common law operative only upon that which was the subject of tenure, since it related to the reversionary right of the Lord to take for want of a tenant, was eventually extended to include personal property, tangible and intangible. The principle was that the right to take that which belonged to no one appertained to the Crown, as jura regalia. The Crown steps in to take the property because it is vacant. [At 297, 74 A.2d 565; citations omitted; emphasis added]
In the area of abandoned or unclaimed personal property, and since 1967, the State has moved to a custodial rather than a true escheat scheme. Under the custodial scheme the holder of abandoned or unclaimed property surrenders the fund or property to the State Treasurer, who then holds the property for the benefit of the rightful owner or his successor. Essentially, the *88 State Treasurer is a trustee for the rightful owner. The distinction between an escheat and a custodial taking were set forth by the court in Commonwealth of Pennsylvania v. Kervick, 114 N.J.Super. 1, 274 A.2d 626 (Ch.Div.1971), rev’d on other grounds, 60 N.J. 289, 288 A.2d 289 (1972):
Escheat in New Jersey derives from the right of sovereignty of the State “as the original and ultimate proprietor” of all property within its jurisdiction. The purpose of all escheat laws is not only to enrich the State but to put into active use funds that are unclaimed and lying dormant. Yet, escheats statutes should be distinguished from custodial statutes which make the State a custodian of the abandoned property, subject to delivery to those who prove ownership or a right to possession. [At 86, 274 A.2d 626]
Generally, the public policy of the State is in favor of the custodial taking of abandoned or unclaimed property by the State Treasurer. That public policy is embodied in N.J.S.A. 2A:37-29, which provides:
.. . [Unclaimed personal property, presumed abandoned ..., shall be delivered or paid to the State Treasurer for safekeeping, and for the use of the State. Repayment shall be made by the State Treasurer thereafter to any person establishing her entitlement to said personal property.
This public policy is so strong that attempts to circumvent a custodial taking by private arrangements or private law have been declared invalid. State v. Jefferson Lake Sulphur Co., 36 N.J. 577, 596, 178 A.2d 329 (1962). Similarly, because of the remedial effect of the custodial scheme, the prevailing custodial statutes have been given a liberal interpretation in favor of the State and as to the position of any stakeholder or obligor. State v. Sperry and Hutchinson Co., 23 N.J. 38, 44, 127 A.2d 169 (1956).
In New Jersey there are at least 18 separate statutory provisions dealing with various types of unclaimed or abandoned personal property. However, there is no specific statutory provision dealing with tax refunds, such as held by counsel for the plaintiffs in this matter. The closest statutory provision would be N.J.S.A. 2A:37-30(a), which concerns the custodial taking of “any monies payable on other general cash obligations”; however, that provision requires a five-year holding period before the presumption of abandonment arises. This statutory provi *89 sion is ordinarily applicable to a corporate context, where there will be a long-lasting or continuing entity. That provision does not contemplate abandoned funds in the possession of a disbursing agent with a limited purpose, as is the situation in this case.
In the absence of a specific statutory provision dealing with the property involved, the general common law would be applicable. Applying the general common law in light of the announced public policy, the unclaimed tax refunds should be paid over to the State Treasurer as a custodial taking, to be held by the State Treasurer awaiting claim by the party entitled thereto or his successor in interest.
Since this fund represents a refund of monies paid as a result of excessive tax assessments levied by the borough, it is clear that the borough has no claim to a return thereof. Thus, borough’s position is no greater than a claim of any other obligor in an unclaimed property situation. In State v. Sperry and Hutchinson Co., supra, the court emphasized that the right of the State to unclaimed property is superior to that of any stakeholder or obligor which had custody but no moral or legal claim to the retention of the unclaimed amount.
The retainer agreements as to each plaintiff clearly set forth the counsel fee to be paid. The fact that the whereabouts of certain taxpayers cannot be ascertained is no reason to disturb that agreement. The result contemplated in the agreement, i.e., reduction of taxes, was achieved. In addition to ratifying the counsel fees, the sum of $124.44 will be allowed to plaintiffs’ counsel as reimbursement for the costs of publication as directed by the court. No allowance will be made for counsel’s efforts in attempting to ascertain the whereabouts of the missing 13 taxpayers. Such efforts had to be made regardless of the result and are within the contemplation of the normal and expected duties of an attorney in such circumstances. It is to be noted that no claim for additional fees is made where the efforts were successful.

Over 500 owners of complexes located in the luxury high-rise building known as Winston Towers took tax appeals. The other complainants are represented by different counsel. Those complaints were disposed of in identical fashion to the 325 complaints discussed herein.

These appeals, it should be noted, were for the years 1975, 1976 and 1977. The order was entered May 17, 1982.

Written retainer agreements had been secured from each taxpayer.

In addition to sending certified letters, return receipt requested, to each of the 13 taxpayers to their last known addresses, counsel conducted title searches, made inquiry of the Winston Towers management, made inquiries of attorneys who represented such taxpayers in the past and of the New Jersey Division of Motor Vehicles. Additionally, appropriate notices were published on three occasions in the Bergen Evening Record newspaper.

The court treated this claim as a motion to vacate the judgments entered pursuant to settlement and to restore these 13 matters to the trial calendar.

This agreement notwithstanding, it was estimated that the trial of these matters would still have consumed approximately one week.