792 A.2d 396

BRIAN W. CLYMER, TREASURER OF THE STATE OF NEW JER-
SEY, IN HIS CAPACITY AS THE UNCLAIMED PROPERTY AD-
MINISTRATOR, PLAINTIFF–APPELLANT, v. SUMMIT BAN-
CORP., FORMERLY UJB FINANCIAL CORPORATION, A NEW
JERSEY CORPORATION, DEFENDANT–RESPONDENT.

Argued September 25, 2001—Decided March 7, 2002.

58

*Patrick DeAlmeida,* Deputy Attorney General, argued the cause for appellant (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Nancy Kaplen* and *Michael J. Haas,* Assistant Attorneys General, of counsel).

*William C. Slattery* argued the cause for respondent (*Slattery & Jespersen,* attorneys).

*David Owen* submitted a brief on behalf of amicus curiae National Association of Unclaimed Property Administrators (*Rab-*

*ner, Allcorn, Baumgart & Ben-Asher,* attorneys; *Mr. Owen, David J. Epstein,* a member of the California bar and *Robert P. Krenkowitz,* a member of the Arizona bar, on the brief).

*Michael S. Haratz* submitted a brief on behalf of amicus curiae State of Alaska (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys).

The opinion of the Court was delivered by

VERNIERO, J.

This is a case of first impression. We are called on to interpret certain provisions of the Uniform Unclaimed Property Act, *N.J.S.A.* 46:30B–1 to –109 (the Act). The unclaimed property at stake consists of principal and interest in excess of $500,000, arising from bonds issued by various governmental entities. We must determine whether that property must lay unclaimed or dormant for five years pursuant to *N.J.S.A.* 46:30B–7 before it is turned over to the State, or whether the dormancy period is one year as set forth under *N.J.S.A.* 46:30B–41.2. The trial court concluded that the one-year period applied. The Appellate Division disagreed, holding that the five-year period governed. We agree with the trial court and now reverse.

I.

The parties have stipulated the essential facts, which we summarize briefly. From time to time, certain governmental entities borrow money from the public, issue bonds evidencing their obligation to repay, and appoint banks as trustees to perform certain administrative functions. Those functions are specified in a bond resolution or trust indenture that serves essentially as the contract for a particular transaction.

Generally stated, bonds are issued either in coupon or registered form. A coupon bond is a bearer-negotiable instrument to which "interest coupons" are attached. Bondholders present those coupons for payment on assigned due dates. A registered

bond is a bond that is payable to a specific owner listed on the bond registry of the issuer. The bank, as trustee or paying agent, is responsible for mailing a check in the amount of the payable interest to the owner at the registered address. When the issuing entity pledges revenue from a project funded through the bonds as security, the bank holds the revenue to ensure that the covenants and other provisions of the indenture are followed. In the event of a default, the bank is responsible for enforcing the remedial provisions of the contract.

In this case, Summit Bank, formerly United Jersey Bank (the Bank), has served as trustee and paying agent in connection with numerous bonds issued by various governmental entities. The bonds fall into several categories: general revenue bonds issued for the purpose of financing the construction of hospitals, educational facilities, and housing units; industrial revenue bonds issued to build or modernize a plant or other facility of a private corporation; general obligation bonds that are backed by the government's taxing power; bonds issued by municipal utility authorities or other such special-purpose entities pursuant to statute; and refunding bonds that are issued to pay prior indebtedness by replacing or paying off an outstanding bond that the holder surrenders for new security. The bonds share the common characteristic of having been issued by a public entity.

This case arises because certain payments due and owing to the bondholders have gone unclaimed. As noted by the trial court, "[i]n some instances, the Bank has not paid the bondholder because a bond has not been presented for redemption, an interest coupon has not been presented for payment, a remittance issued has not been negotiated, or a remittance has been returned as undeliverable by the post office." *Clymer v. Summit Bancorp.*, 320 *N.J.Super.* 90, 95–96, 726 *A.*2d 983 (Ch.Div.1998).

As a result of an audit completed in 1994, then-Treasurer Brian W. Clymer (the Treasurer or the State) demanded that the Bank turn over unclaimed funds arising out of bond principal and interest payable on various dates in 1992 and 1993. The State

based that demand on its view that the applicable dormancy period under the Act for unclaimed governmental-bond funds was one year. Although the Bank initially set forth a contrary position, namely, that the abandonment period for such property was five years, it acquiesced to the State's demand. In August 1994, the Bank turned over to the Treasurer an amount in excess of $3 million, the full amount revealed by the 1994 audit.

The State conducted a follow-up audit in 1995. That audit indicated that the Bank "was holding unclaimed property representing outstanding unredeemed bearer and registered governmental bond principal and interest that had become payable between July 1, 1993, and June 30, 1994, and that, according to the Treasurer, would have to be reported and paid to the State before November 1, 1995." *Id.* at 96, 726 *A*.2d 983. Unlike its response to the earlier audit, the Bank refused the Treasurer's demand based on its initial interpretation that the Act did not entitle the State to take custody of the funds until the expiration of the longer dormancy period.

In 1996, the State filed this action seeking an immediate turnover of the disputed funds. The Bank filed a counterclaim to recover the property that it had forwarded to the Treasurer in 1994, claiming that it had mistakenly turned over those funds. Both parties moved for partial summary judgment based on their respective positions regarding the Act's abandonment periods.

In a reported opinion, the trial court granted partial summary judgment in favor of the State. *Id.* at 111, 726 *A*.2d 983. The court considered the Act's various provisions, its legislative history, and the policies undergirding its enactment, as well as the nature of the contractual relationship between the issuers and the Bank. The court reviewed *N.J.S.A.* 46:30B–7, which establishes a general five-year dormancy period for intangible property, and the more specific provision found at *N.J.S.A.* 46:30B–41.2, which provides for a one-year dormancy period for "any intangible property held by [governmental] ... agencies[.]" In ruling in favor of the State, the trial court concluded that "the Bank's overly strict

interpretation not only contravenes well settled rules of statutory construction, but contradicts the important public policy sought to be achieved by the Act." *Clymer, supra*, 320 *N.J.Super.* at 111, 726 *A.*2d 983. The court directed the Bank to remit $531,195.47 to the custody of the Treasurer, in addition to interest in the amount of $259,516.03.

The Appellate Division set aside the trial court's determination. *Clymer v. Summit Bancorp.*, 334 *N.J.Super.* 252, 257, 758 *A.*2d 652 (2000). Although it agreed with the trial court "that there appear[ed] to be strong public policies favoring the result it reached[,]" the panel nonetheless interpreted the statute consistent with the Bank's position. *Id.* at 254, 758 *A.*2d 652. In reaching that result, the panel observed that "[a] court's view of public policy cannot be used to trump the plain language of the statute itself or the clearly expressed intendment of the drafters." *Ibid.* (citing *Gibson v. New Jersey Mfrs. Ins. Co.*, 261 *N.J.Super.* 579, 584, 619 *A.*2d 636 (App.Div.1993)). We granted the State's petition for certification. 167 *N.J.* 630, 772 *A.*2d 932 (2001). We also granted *amicus curiae* status to the National Association of Unclaimed Property Administrators (NAUPA) and to the State of Alaska, both of whom support the Treasurer's position.

## II.

The concept of escheat traces to feudal times in England when title to land reverted to the lord or Crown when a landowner died without heirs. K. Reed Mayo, *Virginia's Acquisition of Unclaimed and Abandoned Property*, 27 *Wm. & Mary L.Rev.*, 409 (1986). An analogous doctrine, *bona vacantia* (vacant goods), authorized the Crown to take custody of personal property. *Id.* at 411. Those two concepts were exported to the United States, and in the first half of the twentieth century many jurisdictions began to escheat intangible personal property. *Id.* at 416. New Jersey was one of those states. *L.* 1946, *c.* 155; *State v. Sperry & Hutchinson Co.*, 23 *N.J.* 38, 42, 127 *A.*2d 169 (1956).

Following the Second World War, the National Conference of Commissioners on Uniform State Laws (Conference) drafted the first of what would be several model acts governing the disposition of unclaimed property. *Mayo, supra,* at 417–18. In 1989, New Jersey adopted the current Act, which codifies the Conference's 1981 model act. In contrast to earlier enactments, the Act provides that the title to unclaimed property does not vest in the State, but rather remains in the owner. "The question is no longer whether the owner shall forfeit the property to the State as it had been when there was an absolute escheat, but rather whether the State or the holder shall have use of the property until the owner claims it and whether the State or the holder shall enjoy the windfall if the owner never claims it." *State v. Elsinore Shore Assocs.,* 249 *N.J.Super.* 403, 406, 592 *A.*2d 604 (App.Div. 1991).

Under the Act, the State takes custody of the property and has full use of it until the rightful owner comes forward to claim it. *Ibid.* The trial court succinctly summarized that aspect of the statute:

Regardless of the applicable dormancy period, once turned over to the Treasurer, title to the unclaimed property does not vest in the State but remains in the owner, as the State only assumes custody of the intangible property until the owner or his or her successors assert a claim that is verified and allowed. In the meantime, the property is placed in the Unclaimed Personal Property Trust Fund and the Treasurer has the discretion to transfer a percentage of these funds to the State Treasury's General Fund. *N.J.S.A.* 46:30B–74. Seventy-five percent of all proceeds from property received by the State (except abandoned child support funds) is transferred from the unclaimed property trust funds to the General State Fund; the balance is used to pay claims of persons who establish their ownership of the presumptively abandoned property in the State's custody. *Id.*

Thus, all unclaimed funds are held by the Treasurer as trustee for the public interest. Notice is published in newspapers of general circulation listing the missing owners. *N.J.S.A.* 46:30B–51. A person may make a claim to the property at any time in perpetuity. *N.J.S.A.* 46:30B–77. Notably, when a claim is verified and paid, the Treasurer pays interest for the period during which the monies were in state custody. *N.J.S.A.* 46:30B–79. By the same token, upon delivery of the unclaimed property to the Treasurer, a holder is fully and unconditionally relieved of all liability concerning the property. *N.J.S.A.* 46:30B–61. If some party thereafter claims the fund by an action against the former holder, the State will

defend the holder against the claim and indemnify the holder against liability. *N.J.S.A.* 46:30B–65.

[*Clymer, supra,* 320 *N.J.Super.* at 98–99, 726 *A.*2d 983.]

The Legislature has directed that the Act be "applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this law among states enacting it." *N.J.S.A.* 46:30B–2. With that mandate in mind, the Legislature determined that property would be presumed abandoned after the expiration of various dormancy periods, depending on the nature of the property in a given case. *See, e.g., N.J.S.A.* 46:30B–11 (applying fifteen-year dormancy period to unclaimed travelers checks); *N.J.S.A.* 46:30B–31 (applying seven-year dormancy period to unclaimed stock dividends and distributions); *N.J.S.A.* 46:30B–44 (applying one-year dormancy period to unclaimed wages).

Central to this appeal are the two provisions that arguably establish competing dormancy periods for unclaimed governmental-bond payments. The first provision, *N.J.S.A.* 46:30B–7 (Section 7), establishes a general dormancy period of five years. It provides:

Except as otherwise provided by this chapter, all intangible property, including any income or increment derived therefrom, less any lawful charges, that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than five years after it became payable or distributable is presumed abandoned.

[*Ibid.*]

The second provision, *N.J.S.A.* 46:30B–41.2 (Section 41.2), establishes a one-year dormancy period that applies specifically to any intangible property "held by" governmental entities. That provision states:

Except as otherwise provided in this article, any intangible property held by the executive, legislative, or judicial branch of the United States Government, or a state, or a county or municipal subdivision of a state, or any of their authorities, agencies, instrumentalities, administrations, services or other organizations, and remaining unclaimed for more than one year after it became payable or distributable is presumed abandoned.

[*Ibid.*]

The Act further defines "intangible property" to include "[m]oneys deposited to redeem stocks, bonds, coupons, and other securities, or to make distributions[.]" *N.J.S.A.* 46:30B–6i(4). The parties do not dispute that the funds on deposit at the Bank constitute "intangible property" within the statutory definition of that term.

Our task is a narrow one. We must determine, within the meaning of the competing abandonment provisions, whether the unclaimed funds have been "held by" the governmental entities or by the Bank. Relevant to that determination, the Act defines "holder" as "a person, wherever organized or domiciled, who is: (1) In possession of property belonging to another, (2) A trustee, or (3) Indebted to another on an obligation." *N.J.S.A.* 46:30B–6g. The Act describes "person" as "an individual, business association, state or other government, governmental subdivision or agency[.]" *N.J.S.A.* 46:30B–6l.

Faced with the same task, the courts below rendered vastly different conclusions. The trial court found that "[u]nder the plain language of [the Act], the government entities involved here are holders of the funds in issue." *Clymer, supra,* 320 *N.J.Super.* at 101, 726 *A.*2d 983. In contrast, the Appellate Division concluded that the term "holder" connotes "the person or entity in whose possession the funds are at the time of escheat[,]" which is, in this instance, the Bank. *Clymer, supra,* 334 *N.J.Super.* at 256, 758 *A.*2d 652.

### III.

With the issue so framed, we note preliminarily that resolution of this dispute has been mooted by the passage of time. The contested property has been unclaimed for at least five years. Therefore, under either interpretation of the Act, the dormancy period has expired. The threshold issue, then, is whether this case should be decided in its current posture. To answer that question, we must determine whether the State's appeal, although technically moot, presents a question that is both important to the

public and likely to recur. See *State v. Gartland*, 149 *N.J.* 456, 464, 694 *A*.2d 564 (1997) (observing that resolving issues that are both significant and likely to recur "is worth the judicial effort").

There is little doubt that this case involves an important issue of statutory construction. As noted, custodial escheat under the Act allows the State to use unclaimed funds for the public good, and large sums are at stake. Moreover, we are satisfied that controversies similar to this one will present themselves in the future. Accordingly, we elect to decide this case on its merits. *See also State v. Hackett*, 166 *N.J.* 66, 70, 764 *A*.2d 421 (2001) (electing to resolve criminal appeal even though defendant had passed away because case involved "important public issues in need of resolution").

■ We turn now to the parties' respective positions. The State argues that as a "person" under the Act, a governmental or public-entity issuer is indebted to bondholders and, therefore, is "indebted to another on an obligation[.]" *N.J.S.A.* 46:30B–6g(3). Viewed in that context, the public entities here fit within the meaning of "holder." On the other hand, an entity in the Bank's position can be viewed as a "person" who is serving as "[a] trustee" as contemplated by *N.J.S.A.* 46:30B–6g(2), or who is "[i]n possession of property belonging to another[.]" *N.J.S.A.* 46:30B–6g(1).

Because the Act's definition of holder would appear to apply to both the governmental issuers and to the Bank, the Court is confronted with an ambiguity within the framework of the competing abandonment periods. We have observed:

> [When a] statute is not clear and unambiguous, we consider sources other than the literal words of the statute to guide our interpretative task. "If the text ... is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent." Above all, we "seek to effectuate the 'fundamental purpose for which the legislation was enacted.'"
>
> [*Aponte–Correa v. Allstate Ins. Co.*, 162 *N.J.* 318, 323, 744 *A*.2d 175 (2000) (internal citations omitted).]

■ The legislative history of the Act includes a bill statement that generally describes the statute and its distinguishing features. As previously noted, one of those features is that title to unclaimed property under the Act remains in the owner while "the [S]tate has the full use of the property." Senate Judiciary Committee, *Statement to Senate Bill No. 2093 reprinted in N.J.S.A.* 46:30B-1. We discern from that history, and the overall structure of the Act, that the Legislature intended a broad interpretation in favor of the State. In that regard, we agree with a similar observation of the Tax Court:

Generally, the public policy of the State is in favor of the custodial taking of abandoned or unclaimed property by the State Treasurer.... This public policy is so strong that attempts to circumvent a custodial taking by private arrangements or private law have been declared invalid. Similarly, because of the remedial effect of the custodial scheme, the prevailing custodial statutes have been given a liberal interpretation in favor of the State and as to the position of any stakeholder or obligor.

[*Safane v. Cliffside Park Borough,* 5 *N.J.Tax* 82, 88 (1982) (internal citations omitted).]

■ The NAUPA and State of Alaska, as *amici curiae,* articulate a similar public policy in support of the Treasurer's position. Additionally, there appears to be no reported judicial decision either in New Jersey or in any other jurisdiction on this precise issue. In the absence of such case law, the Treasurer's construction of the statute takes on added significance. The Bank correctly points out that the Treasury Department's 1991 informational brochure did not specifically describe a one-year abandonment period for unclaimed governmental-bond proceeds. Nonetheless, the State's position has been consistent and is entitled to substantial weight in this setting. "Normally we defer to the interpretation ascribed to a statute by an administrative agency charged with responsibility for assisting in the implementation of the legislative design." *Reuter v. Fort Lee Borough Council,* 167 *N.J.* 38, 48, 768 *A.*2d 769 (2001) (LaVecchia, J., concurring and dissenting).

We hold, therefore, that the one-year dormancy period found at Section 41.2 governs the disputed property. We view that proper-

ty as being "held by" the various governmental entities for the narrow purpose of determining the applicable abandonment period. In reaching our holding, we agree with the trial court that

[a]lthough the Bank may have physical possession of the funds that are unclaimed, these funds represent the indebtedness of the governmental entities and are payable to the bondholders. Accordingly, the governmental entity is considered the ultimate obligor and thus a "holder" as that term is defined in Section 6(g) and employed in Section 41.2.

[*Clymer, supra,* 320 *N.J.Super.* at 102, 726 A.2d 983.]

Our conclusion is consistent with the Legislature's intent in enacting the statute, consonant with the State's strong public policy favoring custodial escheat, and reflective of a sensible reading of the statute itself. Further, our disposition gives appropriate weight to the interpretation of the administrative agency responsible for implementing the Act.

In its thoughtful and comprehensive brief, the Bank urges a contrary conclusion. Its argument is basically threefold. First, the Bank submits that earlier versions of the model act support its position. In the same vein, the Bank argues that no rational distinction can be drawn between owners of governmental bonds and owners of corporate bonds that would justify imposing a shorter dormancy period in these circumstances. Second, the Bank contends that a careful reading of the Act supports its construction without resort to extrinsic aids. Third, the Bank argues that the bond documents relieve the governmental entities of their obligation to disburse funds to the bondholders and, therefore, those entities cannot be viewed as "holders" under the Act. We will address each contention separately.

The Appellate Division found that earlier versions of the model act applied a seven-year dormancy period irrespective of whether the bond proceeds were held by a private or governmental entity. *Clymer, supra,* 334 *N.J.Super.* at 255, 758 A.2d 652. More specifically, the 1966 model act distinguished between intangible property held by a "public authority" under section 8 (the predecessor to Section 41.2), and property held "in the ordinary course of the holder's business" under section 9 (the predecessor to

Section 7). *Compare Uniform Unclaimed Property Act* §§ 8, 9 (1966) *with N.J.S.A.* 46:30B-7, -41.2. The 1966 act, however, established a seven-year dormancy period in both circumstances. *Uniform Unclaimed Property Act* §§ 8, 9 (1966).

Focusing on that history, the Bank contends that the drafters of the current Act intended to retain a longer abandonment period for governmental-bond proceeds, but shortened it to five years. The Bank argues that "moneys to redeem bonds or pay bond coupons were *not* within the coverage of [section] 8 of the 1966 [model act] ... [and, therefore,] there is no basis whatsoever for concluding that such property *is* within the coverage of *N.J.S.A.* 46:30B-41.2." The Bank's contention is belied by the fact that New Jersey's Act, unlike the 1966 model act, explicitly sets forth the differing abandonment periods in Sections 7 and 41.2. Further, we disagree with the Bank's premise that our Legislature did not intend the disputed property to fall within the ambit of Section 41.2. In the last analysis, we find nothing in the text or history of the current Act to demonstrate convincingly that our Legislature intended the longer dormancy period to apply in these circumstances.

The Bank also contends that distinguishing between owners of governmental bonds and owners of private bonds for purposes of the Act's dormancy periods is irrational. We disagree. That the Legislature would design a shorter dormancy period for public-bond proceeds appears reasonable to the Court. Because the unclaimed funds have been generated by bonds issued by one or more public entities, the public itself should realize any benefit yielded by that property in the shortest time possible. As important, the bondholders are not materially prejudiced by the shorter dormancy period. The bondholders remain owners of the property while it is in the State's custody, and the Treasurer must pay interest to any owner if and when the property is claimed.

Consistent with our canons of construction, we also are persuaded that, to the extent that they conflict, the more specific provision under Section 41.2 in respect of property held by governmental

entities should trump the general provision found at Section 7. *See Kingsley v. Wes Outdoor Adver. Co.*, 55 *N.J.* 336, 339, 262 *A.*2d 193 (1970) ("When there is a conflict between a general and a specific act on the same subject, the latter shall prevail."); *New Jersey Transit Corp. v. Borough of Somerville*, 139 *N.J.* 582, 591, 661 *A.*2d 778 (1995) ("It is a well established precept of statutory construction that when two statutes conflict, the more specific controls over the more general.").

The Bank's statutory argument is equally unavailing. In a nutshell, the Bank contends that the Act's use of the term "held by" signifies a person in actual possession of property, not merely a person indebted to another on an obligation. It supports that contention by citing other sections of the Act that more precisely employ terms like "issued in the ordinary course" and "owing" to describe certain payments, funds, or property. *See, e.g., N.J.S.A.* 46:30B–42 (applying five-year abandonment period to "[a] credit memo issued in the ordinary course of an issuer's business"); *N.J.S.A.* 46:30B–44 (applying one-year abandonment period to "[u]npaid wages . . . owing in the ordinary course of the holder's business"). Thus, argues the Bank, "when the Legislature intended to cover property that was 'issued' or 'owing' by the holder, it said so[.]"

The Bank's position only underscores our belief that the statute is susceptible to differing interpretations. In confronting those competing interpretations, we have accepted the construction that we perceive to be more consonant with the Legislature's overarching goal in enacting the statute. We acknowledge that Section 41.2 might have been more precisely drawn, but it is clear enough for us to discern the intent of the drafters. See *Loboda v. Township of Clark*, 40 *N.J.* 424, 435, 193 *A.*2d 97 (1963) ("Isolated [statutory] expressions cannot be invoked to defeat a reasonable construction."); *Jersey Cent. Power & Light Co. v. State Bd. of Tax Appeals*, 131 *N.J.L.* 565, 567, 37 *A.*2d 111 (E.&A.1944) ("The context must be looked to for the true sense of a particular word or expression.").

The trial court discussed at length the Bank's remaining argument in respect of the contractual obligations of the various issuers and the Bank. That discussion does not need to be repeated here. Suffice it to say that we are in accord with the essence of the court's analysis and with its ultimate conclusion that the Bank's multifaceted contractual role did not "change[ ] the nature of the underlying obligation or detract[ ] from the public entity's status as a 'holder' within the meaning of *N.J.S.A.* 46:30B 6(g)." *Clymer, supra,* 320 *N.J.Super.* at 107, 726 *A.*2d 983. Stated differently, "there is no indication that our Legislature intended the applicable dormancy period for payments on government bonds ... to randomly depend on a strict interpretation of bond documents variously defining the fiduciary's contractual responsibilities." *Id.* at 109, 726 *A.*2d 983.

## IV.

The judgment of the Appellate Division is reversed.

STEIN and LONG, JJ., dissenting.

We would affirm the judgment below substantially for the reasons set forth in Judge Kestin's thoughtful opinion for the Appellate Division, *Clymer v. Summit Bancorp.,* 334 *N.J.Super.* 252, 253–57, 758 *A.*2d 652 (2000).

*For reversal*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO, LaVECCHIA, and ZAZZALI—5.

*For affirmance*—Justices STEIN and LONG—2.