3 A.3d 608 (2010)
416 N.J. Super. 151
HAVEN SAVINGS BANK, Plaintiff-Respondent,
v.
Kathleen M. ZANOLINI and Mr. Zanolini, Husband of Kathleen M. Zanolini, and Citadel Condominium Association, Inc., Defendants-Respondents.
Global Discoveries, Ltd., as Attorney-in-Fact for Kathleen M. Zanolini, Appellant.
New York Community Bank, Plaintiff-Respondent,
v.
Donie Ray Anderson and Mrs. Donie Ray Anderson, his Wife, Frances Anderson and Mr. Anderson, Husband of Frances Anderson, and Kimball Medical Center, Defendants-Respondents.
Global Discoveries, Ltd., as Attorney-in-Fact for Donie Ray Anderson, Appellant.
Docket Nos. A-3962-08T1, A-4069-08T1
Superior Court of New Jersey, Appellate Division.
Telephonically Argued February 18, 2010.
Decided September 7, 2010.
*610 Oren Klein argued the cause for the appellant (Parker McCay P.A., attorneys; Mr. Klein and Emmanuel J. Argentieri, of counsel; Stacy L. Moore, Jr., Marlton, on the brief).
Respondents have not filed briefs.
Before Judges CUFF, PAYNE, and C.L. MINIMAN.
The opinion of the court was delivered by
MINIMAN, J.A.D.
Defendant Global Discoveries, Ltd. (Global), as attorney-in-fact for defendants Kathleen M. Zanolini (Zanolini) and Donie Ray Anderson (Anderson), appeals from the reduced fees awarded to it in a March 12, 2009, order. That final order awarded surplus funds generated by the Hudson County Sheriff's sales of two mortgaged premises, one formerly owned in Hoboken by Zanolini and the other formerly owned in Bayonne by Anderson, to Global's clients, neither of whom was aware of the surplus funds until the funds were brought to their attention by Global. Because the New Jersey Uniform Unclaimed Property Act (NJUUPA), N.J.S.A. 46:30B-1 to -109, permits an award of the fees to which Anderson agreed, we now reverse. However, we affirm the judgment as to Zanolini because that agreement did not satisfy the requirements of N.J.S.A. 46:30B-106.

I.
Defendant Kathleen M. Zanolini is the former owner of realty commonly known as 450 Seventh Street, Apt. 2-I, Hoboken. Zanolini gave a mortgage on the property to Haven Savings and Loan Association, now known as Haven Savings Bank (Haven), on April 4, 1986. After Zanolini failed to make payment as scheduled, Haven began foreclosure proceedings in 2006. It obtained a final judgment of foreclosure on September 4, 2007, in the amount of $24,497.88. The Hudson County Sheriff subsequently sold the property to a third-party purchaser on November 29, 2007, and deposited $164,674.24 with the Clerk of the Superior Court, Trust Fund Unit, as surplus funds arising from the sale.
Global is in the business of assisting individuals recover funds to which they are entitled from the Trust Fund Unit. Global obtains lists, docket summaries, deeds, mortgages, liens, and other documents from various counties in New Jersey to determine if individuals are owed any funds. Global then locates the individuals and informs them of their entitlement. Global employs eighteen to twenty full-time employees and pays the out-of-pocket expenses incurred in finding the funds, obtaining the records, and locating the individuals. Global informs the located individuals of the amount of funds to which they are entitled. If the person agrees to engage their services in recovering the funds, a ratification agreement and a limited power of attorney are executed. The power of attorney gives Global the right to act on the individual's behalf, including filing a claim for the surplus funds. Global's standard fee for its services is thirty-five percent of the amount recovered.
Global first contacted Zanolini sometime in 2008 to assist her in recovering the surplus funds to which she was entitled. Zanolini executed an agreement and a limited *611 and specific power of attorney in favor of Global on July 11 and 19, 2008, respectively. The pertinent part of the agreement states:
(a) Client and Global agree that Global's compensation is contingent upon Client actually receiving Client's share of the funds. In the event your claim is not paid, all Parties are released of their duties and obligations under this agreement and Client will have no obligation whatsoever to compensate Global.
(b) Client agrees that Global will receive a 35% net contingency fee. Client will provide Global with a written assignment of the Client's rights to claim the funds.
(c) For clarification, Global is ONLY entitled to its net percentage of the funds that are actually collected.
The power of attorney essentially gave Global the right to act on Zanolini's behalf in obtaining the funds held by the Trust Fund Unit. On September 11, 2008, Global filed a notice of motion for distribution of surplus funds on behalf of Zanolini, and the motion was scheduled to be heard on October 10, 2008.
Defendant Donie Ray Anderson is the former co-owner of realty commonly known as 100 West Forty-fourth Street, Bayonne. Anderson gave a mortgage on the property to First Savings Bank of New Jersey, now known as New York Community Bank (Community), on August 12, 1993. After Anderson defaulted on his mortgage, Community began foreclosure proceedings in 2004. It obtained a final judgment of foreclosure on March 20, 2005, in the amount of $68,578.43. The Hudson County Sheriff subsequently sold the property to a third-party purchaser on June 16, 2005, and deposited $113,722.98 with the Trust Fund Unit as surplus funds arising from the sale. Anderson, as a former co-owner of the property, was entitled to half this amount.
Global first contacted Anderson sometime in 2008 to assist him in recovering the surplus funds. Anderson executed an agreement and a limited and specific power of attorney in favor of Global on June 30 and July 9, 2008, respectively. The terms of the agreement and the power of attorney were nearly identical to those signed by Zanolini, including the thirty-five-percent fee. On September 12, 2008, Global filed a notice of motion for distribution of surplus funds on behalf of Anderson, and the motion was scheduled to be heard on October 10, 2008.
The October 10, 2008, hearing was held before the Hudson County General Equity judge. At that hearing, Citadel Condominium Association (Citadel) claimed it was owed $11,611.83 for past-due maintenance fees and other assessments relating to Zanolini's property. The application was unopposed, and the judge ordered payment of that amount to Citadel from the surplus funds.
Regarding Global's motions for the surplus funds, Zanolini testified, upon questioning by the judge, that Global initially solicited her by mail and made contact with her through family members. After Zanolini gave her attorney the information Global gave her, Zanolini's attorney contacted Global. Zanolini later signed an agreement with Global, pursuant to which Global would receive thirty-five percent of the amount to be recovered from the Trust Fund Unit. She understood that this meant she would pay Global $53,396.84. The trial judge then advised that he would not enter an order allowing Global to recover a thirty-five-percent fee, and he refused to sign the order under which the funds would be distributed to Zanolini.
The General Equity judge held plenary hearings on February 2, 3, and 26, 2009, *612 after no settlement was reached. Jed Byerly, Global's Chief Operating Officer, described Global's business operations and the typical way in which the company processes cases. Byerly then described, with reference to documents entered into evidence, the time spent and nature of the work done on the Zanolini case. This included sixty-three and one-quarter hours worked by the claims manager; eight hours and twenty-five minutes worked by a research analyst; a $350 bill from Zanolini's attorney paid by Global; and hard costs incurred, totaling $13,407.54. The work also included research to locate Zanolini. The court particularly took issue with an entry indicating that one hour and fifteen minutes was spent ordering flowers for Zanolini when she was hospitalized, and Byerly was unable to explain the entry.
Zanolini consulted with an attorney after receiving a copy of the agreement. Global paid her attorney's $350 fee and other fees to prosecute the case. Byerly was not aware of any statements made by Zanolini about her not wanting Global to receive the thirty-five-percent fee. He was also unaware that, according to the court, Zanolini had previously represented that she was unaware that she was paying approximately $50,000 to make this application, although this contradicted the testimony given by Zanolini on October 10, 2008.
Byerly next testified regarding the Anderson case. The first exhibit included a summary of Global's costs. The claims manager spent 56.65 hours on the Anderson case obtaining information and locating Anderson. After contacting Anderson, Global advised him in writing as to the amount of the surplus funds to which he was entitled, and Anderson entered into the agreement. Byerly testified that Anderson had the opportunity to review the agreement and power of attorney before signing them. Byerly believed Anderson was unaware of the surplus funds before Global contacted him. He also believed Anderson was "still agreeable" to the thirty-five-percent fee.
Zanolini was examined telephonically by the judge. She stated that she understood she was entitled to surplus funds in the amount of $164,674.24 as a result of the sheriff's sale. Before Global contacted her, Zanolini was made aware of her entitlement to the funds when her bank and another company had contacted her. Global first contacted Zanolini via telephone. Zanolini gave three versions of when she was informed about the specific amount she was owed: (1) she first learned when she signed the contingency agreement; (2) she first learned at the October 11, 2008, hearing; and (3) she did not remember ever hearing from Global about the specific amount. Regardless, she reviewed the agreement with her attorney, understanding that Global would attempt to obtain the money and she would pay Global a commission. She also understood that Global's commission would be thirty-five percent, although that "seemed like an excessive amount."
Anderson also testified that Global first contacted him by telephone and informed him of the services that it would provide and the fee it would charge. Global employees discussed the terms of the contract with Anderson and he read the contract himself. From this, he understood he was entitled to the funds, although no one told him the exact amount. He was also given a thirty-five-percent figure; however, he could not remember if he was going to receive or pay thirty-five percent. Anderson did not consult a lawyer about the agreement. He believed a letter he received from Global stated that he was entitled to $126,000, and he could not remember if anyone from Global verbally *613 informed him of the amount. The judge then asked Anderson about the fee, with the following exchange occurring:
Q And but you did sign a contract with Global?
A Yes, sir, I did.
Q All right. Are you surprised now thatof the terms of that contract?
A A little bit, but . . . can I clarify[?]
Q Oh, of course.
A II don't understandthey done all the work. They doing all the work. They doing all the labor. . . .
. . . .
Q Why . . . are you surprised? Do you think they should get more money?
A No. No. No. No. No. I think they their share. I think it's fair.
Anderson further testified that he was not surprised by the fee because Global "did all the paperwork and everything." The judge then confirmed for Anderson that he would be entitled to only his one-half interest in the funds as the former co-owner, equal to approximately $56,000, and Global's fee would be thirty-five percent, approximately $19,700.
On March 12, 2009, the General Equity judge issued an oral decision[1] in which he found that the amount of the fees in proportion to work done were "incredible" and "outrageous." He determined that the agreements were contracts of adhesion because they were standardized printed forms that were not negotiated and injustice would result if they were enforced, relying on Rudbart v. North Jersey District Water Supply Commission, 127 N.J. 344, 354, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). Thus, the judge reduced Global's fee from Zanolini to hard costs of $13,407.54, with no compensation for time expended; and its fee from Anderson was reduced to hard costs of $5918.44, again with no compensation for Global's efforts. Zanolini received the remaining $151,266.70 of the original $164,674.24 in surplus funds, and Anderson received $50,943.05 of the original $56,861.49. The judge gave no consideration to the NJUUPA. Global filed notices of appeal in both matters, one on April 22 and the other on April 24, 2009. We consolidated the appeals on June 15, 2009, and the General Equity judge stayed the orders on August 6, 2009.

II.
Global contends on appeal that the General Equity judge mistakenly exercised his discretion to void two valid agreements between former property owners and Global made pursuant to and in compliance with N.J.S.A. 46:30B-106. Specifically, Global urges that in 1989 New Jersey adopted the Uniform Unclaimed Property Act and in doing so specifically provided that agreements such as those here were valid so long as the fee did not exceed thirty-five percent of the property's value, was in writing, was signed by the owner, and disclosed the nature and value of the property and the value of the owner's share after the fee had been deducted, citing N.J.S.A. 46:30B-106. Global argues that the General Equity judge erred in departing from the statute and using equitable powers to divest Global of its legal rights. It contends the judge erred in setting aside the legislative judgment as to the quantum of a fair fee for recovery of unclaimed property. Global also contends the judge erred in voiding the contracts *614 sua sponte when Zanolini and Anderson did not contest them. It asserts that Rule 4:57-2 does not permit the action taken by the judge. Finally, Global contends the judge erred in finding that the agreements were unenforceable contracts of adhesion.
If a judge makes a discretionary decision, but acts under a misconception of the applicable law, we need not defer to that exercise of discretion; instead, we adjudicate the controversy under applicable law in order to avoid a manifest denial of justice. State v. Steele, 92 N.J.Super. 498, 507, 224 A.2d 132 (App.Div.1966); Kavanaugh v. Quigley, 63 N.J.Super. 153, 158, 164 A.2d 179 (App.Div.1960). In any case, a "trial court's interpretation of the law and the consequences that flow from established fact are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). Thus, the trial judge's legal conclusions and the application of those conclusions to the facts are subject to plenary review. Ibid.

III.
In 1995, the National Conference of Commissioners on Uniform State Laws (NCCUSL) approved the 1995 Uniform Unclaimed Property Act (1995 Uniform Act). Unif. Unclaimed Prop. Act, Historical Notes, 8C U.L.A. 87 (1995). The 1995 Uniform Act superseded its predecessor uniform acts: the 1954 Uniform Disposition of Unclaimed Property Act (1954 Uniform Act); its revisions in 1966 (1966 Uniform Act); and the 1981 Uniform Unclaimed Property Act (1981 Uniform Act). Ibid. According to the NCCUSL website, all four uniform acts were "designed to change the common law and the law of escheat pertaining to abandoned intangible personal property" and make the law uniform around the country. SummaryUnif. Unclaimed Prop. Act (1995), NCCUSL.[2]
Under the 1995 Uniform Act and its predecessors, once property is identified as unclaimed, the property holder is required to report that property to the state unclaimed property administrator. Ibid. After the report is made and notice to the property owners is attempted by the holder, the property is transferred to the administrator. Ibid. The administrator then attempts to notify the owners. Ibid. If cash property remains unclaimed, it is deposited in the state general fund; all other unclaimed intangible property is held for a period of time and then liquidated. Ibid. The administrator maintains a fund from which claims made by owners are paid, and a claims procedure exists for owners to assert their claims. Ibid.
At the time of the 1981 Uniform Act, thirty-one states and the District of Columbia had enacted either the 1954 Uniform Act or the 1966 Uniform Act, and seventeen of the remaining nineteen states had some form of escheat or abandoned property legislation. Unif. Unclaimed Prop. Act, supra, 8C U.L.A. at 153. The 1981 Uniform Act was promulgated in response to Texas v. New Jersey, 379 U.S. 674, 681-82, 85 S.Ct. 626, 630-31, 13 L.Ed.2d 596, 601-02 (1965), in which the Supreme Court established priorities for states asserting claims to abandoned property. Unif. Unclaimed Prop. Act, supra, 8C U.L.A. at 153. Some of these priorities were inconsistent with those contained in the 1954 and 1966 Uniform Acts. Ibid. Thus, the 1981 Uniform Act was drafted to conform with the Court's ruling while continuing to legislatively regulate the disposition of unclaimed property across the country. Id. at 154.
*615 The 1981 Uniform Act also sought to strengthen enforcement provisions and encourage compliance with the Act. Id. at 153-54. The 1981 Uniform Act contained many changes that were unrelated to the Court's decision. Id. at 156-58. One such change was Section 35, entitled "Agreement to Locate Reported Property." Id. at 273. Section 35 simply states, "All agreements to pay compensation to recover or assist in the recovery of property reported under Section 17, made within 24 months after the date payment or delivery is made under Section 19, are unenforceable." Ibid.
In 1995, the NCCUSL again revised the 1981 Uniform Act and promulgated the 1995 Uniform Act. Id. at 87. The promulgation of the 1995 Uniform Act came on the heels of the Supreme Court decision in Delaware v. New York, 507 U.S. 490, 507-10, 113 S.Ct. 1550, 1560-62, 123 L.Ed.2d 211, 226-28 (1993), in which the Court reaffirmed the priorities set forth in Texas, supra, 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596, and resolved other issues unrelated to this discussion.
The 1995 Uniform Act included amended Section 25, entitled "Agreement to Locate Property." Unif. Unclaimed Prop. Act, supra, § 25, 8C U.L.A. at 144-45. Section 25 reads as follows:
(a) An agreement by an owner, the primary purpose of which is to locate, deliver, recover, or assist in the recovery of property that is presumed abandoned is void and unenforceable if it was entered into during the period commencing on the date the property was presumed abandoned and extending to a time that is 24 months after the date the property is paid or delivered to the administrator. This subsection does not apply to an owner's agreement with an attorney to file a claim as to identified property or contest the administrator's denial of a claim.
(b) An agreement by an owner, the primary purpose of which is to locate, deliver, recover, or assist in the recovery of property is enforceable only if the agreement is in writing, clearly sets forth the nature of the property and the services to be rendered, is signed by the apparent owner, and states the value of the property before and after the fee or other compensation has been deducted.
(c) If an agreement covered by this section applies to mineral proceeds and the agreement contains a provision to pay compensation that includes a portion of the underlying minerals or any mineral proceeds not then presumed abandoned, the provision is void and unenforceable.
(d) An agreement covered by this section which provides for compensation that is unconscionable is unenforceable except by the owner. An owner who has agreed to pay compensation that is unconscionable, or the administrator on behalf of the owner, may maintain an action to reduce the compensation to a conscionable amount. The court may award reasonable attorney's fees to an owner who prevails in the action.
(e) This section does not preclude an owner from asserting that an agreement covered by this section is invalid on grounds other than unconscionable compensation.
[Ibid.]
Section 25 was "intended to enhance the likelihood that the owner of the abandoned property will be located by the efforts of the State, and will receive a return of the property without payment of a `finder's fee.'" Ibid. Section 25 was a distinct departure from the 1954, 1966, and 1981 Uniform Acts in that the uniform act for *616 the first time extensively addressed finder agreements.
To date, twenty-three states[3] and the District of Columbia have adopted the 1981 Uniform Act or a variation of it. Id. at 43 (Pocket Part). An additional fourteen states[4] and the Virgin Islands have adopted the 1995 Act or a variation of it. Id. at 87, 17 (Pocket Part). Thirteen states have not adopted either Act; however, four have adopted the 1954 and 1966 Acts and the remaining nine have various laws pertaining to unclaimed property.[5]
In 1989, New Jersey adopted the 1981 Uniform Unclaimed Property Act, N.J.S.A. 46:30B-1 to -109 (1989 NJUUPA), with a goal of revising the State's escheat law to conform with same. L. 1989, c. 58, § 1 (Senate Judiciary Committee Statement). The Legislature passed the 1989 NJUUPA "for the purpose of establishing comprehensive regulation of access to unclaimed property." Twiss v. State, Dep't of Treasury, 124 N.J. 461, 476, 591 A.2d 913 (1991). Consistent with the 1981 Uniform Act, the 1989 NJUUPA provides that unclaimed intangible property is payable to the state of the last known address of the owner or in certain circumstances to the state of the holder's domicile. L. 1989, c. 58, § 1. The Act also provides that title to the unclaimed property remains with the owner and does not vest in the State. Ibid.; see also Clymer v. Summit Bancorp., 171 N.J. 57, 63, 792 A.2d 396 (2002). The State takes custody of the property and has full use of it until the rightful owner asserts a claim to it. Clymer, supra, 171 N.J. at 63, 792 A.2d 396. A person may make a claim to the property at any time. Ibid. (citations and quotation omitted).
Importantly, the Legislature has instructed that the 1989 NJUUPA be "`applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this law among states enacting it.'" Id. at 64, 792 A.2d 396 (quoting N.J.S.A. 46:30B-2). Thus, the 1989 NJUUPA should be construed to achieve and maintain uniformity with the thirty-nine jurisdictions that have adopted either the 1981 or 1995 Uniform Act.
The specific section of the 1989 NJUUPA at issue here is N.J.S.A. 46:30B-106. That section sets forth the terms under which an agreement to assist an individual or entity in recovering property reported under the statute, including property deposited with the Trust Fund Unit is enforceable. N.J.S.A. 46:30B-106. The version of N.J.S.A. 46:30B-106 enacted in 1989 reads:
All agreements to pay compensation to locate, deliver, recover, or assist in the recovery of property reported under this chapter, entered into during the period commencing one year before the *617 property was presumed abandoned and extending to a time that is 24 months after the date that the property is paid or delivered to the administrator, are void and unenforceable. Otherwise, these agreements are valid only if the fee or compensation agreed upon is not more than 20% of the value of the property recovered, the agreement is in writing, signed by the apparent owner, and clearly sets forth the nature and value of the property and the value of the apparent owner's share after the fee or compensation has been deducted. However, nothing in this section shall be construed to prevent an owner from asserting at any time that an agreement to locate property is based upon an excessive or unjust consideration.
[L. 1989, c. 58, § 1.]
This section was intended to "impose limitations upon agreements to find or locate apparent owners of unclaimed property, limitations that are similar to those adopted by other states enacting the uniform act." S. 2093, 1988 Leg., 202d Sess. (NJ 1989) (Assembly Amendments).
The Legislature subsequently amended N.J.S.A. 46:30B-106 in 1995. L. 1995, c. 361, § 1. The statute now provides:
All agreements to pay compensation to locate, deliver, recover, or assist in the recovery of property reported under this chapter, made within 24 months after the date that the property is paid or delivered to the administrator, are void and unenforceable. Agreements entered into any time after such 24-month period are valid only if the fee or compensation agreed upon is not more than 20% of the value of the property recovered, the agreement is in writing, signed by the apparent owner, and clearly sets forth the nature and value of the property and the value of the apparent owner's share after the fee or compensation has been deducted. Agreements entered into before the property was presumed abandoned are valid only if the fee or compsenation [sic] agreed upon is not more than 35% of the value, the agreement is in writing, signed by the apparent owner, and clearly sets forth the nature and value of the property and the value of the apparent owner's share after the fee or compensation has been deducted. However, nothing in this section shall be construed to prevent an owner from asserting at any time that an agreement to locate property is based upon an excessive or unjust consideration.
[Ibid. (emphasis added).]
The amendment omitted the provision making agreements void and unenforceable when entered into within one year before property is presumed abandoned. N.J.S.A. 46:30B-106 (Historical and Statutory Notes). It also added the sentence relating to the validity of agreements entered into before property is presumed abandoned and set a fee ceiling of thirty-five percent for such agreements. Ibid.
The Senate Judiciary Committee issued a statement regarding the amendments on June 12, 1995. A. 1609, 1995 Leg., 206th Sess. (NJ 1995) (Senate Judiciary Committee Statement). The Committee commented:
Under New Jersey's Unclaimed Property Act, an agreement to pay compensation to locate, deliver, or recover property held by the State as unclaimed property is void and unenforceable, if the agreement is entered during the period commencing one year before the property is paid to the State and extending to a time 24 months after that date. Agreements entered into during that time period are valid only if the fee or compensation agreed upon is not more *618 than 20% of the value of the property recovered.
As amended by the committee, the bill would provide that such an agreement would be enforceable if the agreement is entered into before the property is presumed abandoned and if the fee or compensation agreed to is not more than 35% of the value of property. Agreements entered into more than 24 months after the property was paid or delivered to the State would be enforceable only if the fee or compensation was set at no more than 20% the value of the property involved. Agreements entered into during the 24 months immediately following the date the property was paid or delivered to the State would be unenforceable.
[Ibid.]
In June 1998, the New Jersey Law Revision Commission issued a final report relating to the 1995 Uniform Act. N.J. Law Revision Comm'n, Final Report Relating to Uniform Unclaimed Property Act, at 1 (1998) (1998 Final Report).[6] The 1998 Final Report recommended adopting the 1995 Uniform Act with some variations, although it did not recommend any changes to the 1995 amendment of N.J.S.A. 46:30B-106. Id. at 3, 25. Thus, it did not recommend adoption of Section 25 of the 1995 Uniform Act. Three years later, the Legislature passed Assembly Bill 2507, which amended many sections of the NJUUPA to conform to the 1995 Uniform Act. L. 2002, c. 35, §§ 1 to 65. Consistent with the recommendations in the 1995 Final Report, N.J.S.A. 46:30B-106 was not amended to mirror Section 25 of the 1995 Uniform Act, and the Legislature left the 1995 amendment of this section untouched. Global urges that the third sentence of N.J.S.A. 46:30B-106 governs its agreements with Zanolini and Anderson. In fact, they are so governed, because N.J.S.A. 46:30B-41 (emphasis added) provides:
Property deposited or paid into the Superior Court or to the surrogate of any county in this State to the credit of a specific cause or account under the provisions of any law, order, rule, judgment, or decree and remaining unclaimed for a period of 10 years, shall be presumed abandoned.
The NJUUPA requires the Clerk of the Superior Court to report abandoned property to the administrator, N.J.S.A. 46:30B-46, who is the Treasurer of the State of New Jersey, N.J.S.A. 46:30B-6. When property is presumed abandoned, the Clerk of the Superior Court must give written notice to the apparent owner of the impending presumption of abandonment prior to filing the report with the administrator. N.J.S.A. 46:30B-50. When the report is filed pursuant to N.J.S.A. 46:30B-49, the holder must pay or deliver the unclaimed property to the Treasurer. N.J.S.A. 46:30B-57. Once the presumed abandoned property has been paid over to the administrator, the holder is relieved of all liability. N.J.S.A. 46:30B-61.
Here, the Hudson County Sheriff deposited Zanolini's surplus funds with the Trust Fund Unit on November 29, 2007, and deposited Anderson's surplus funds on June 16, 2005. Neither fund of money was, or even now would be, in danger of becoming presumed abandoned under N.J.S.A. 46:30B-41 and paid over to the Treasurer, because ten years had not elapsed since the money was deposited with the Superior Court Clerk. N.J.S.A. *619 46:30B-41. As such, each agreement was "entered into before the property was presumed abandoned" and neither was void under the first sentence of the statute prohibiting agreements to recover property executed within twenty-four months after the property was paid or delivered to the Treasurer. N.J.S.A. 46:30B-106.
Of the thirty-nine jurisdictions that have adopted the 1981 or 1995 Act, thirty-seven (all except Oregon and West Virginia) have a provision similar to N.J.S.A. 46:30B-106 that renders certain finder agreements unenforceable.[7] Additionally, Missouri, one of the four states that has adopted the 1954 and 1966 Uniform Acts but not the 1981 or 1995 Uniform Acts, also has a provision analogous to N.J.S.A. 46:30B-106. See Mo.Rev.Stat. § 447.581 (1994). None of these sister state provisions have an analogue to the third sentence of N.J.S.A. 46:30B-106 validating agreements made before the property was presumed abandoned, subject to conditions. Very few courts have had the occasion to interpret their state's analogue to N.J.S.A. 46:30B-106. In fact, across the thirty-eight jurisdictions that have a statute comparable to N.J.S.A. 46:30B-106, there appear to be only three cases in which the enforceability of an agreement to recover property was at issue where the court substantively considered some version of N.J.S.A. 46:30B-106.[8]
One of those cases is from New Jersey.[9] In In re Estate of Campbell, 327 N.J.Super. *620 96, 97, 742 A.2d 639 (Ch.Div.1999), the administratrix of the intestate decedent sought an order limiting the amount of compensation due a genealogical firm that had located thirty-five previously unknown heirs. The heirs agreed to compensate the firm at a rate of thirty-five percent of the net proceeds recovered by each heir. Ibid. The parties disputed whether the agreements between the firm and the heirs were unconscionable or void as against public policy. Ibid. Although the General Equity Division found that N.J.S.A. 46:30B-106 did not apply because no property was abandoned and paid into the fund, it nonetheless found that the statute "suggest[ed] no particular hostility toward the agreements in question." Id. at 98-99, 742 A.2d 639. The court reasoned that it was difficult to conclude the agreements were unconscionable or void as against public policy when the thirty-five-percent fee fell within the ceiling set by this statute. Id. at 99-100, 742 A.2d 639.
The second case is Nelson v. McGoldrick, 127 Wash.2d 124, 896 P.2d 1258, 1259, 1265-66 (1995), where the Washington Supreme Court examined the enforceability of an heir-hunter contract with a fifty-percent fee under several legal theories, including Washington Revised Code 63.29.350, Washington's version of N.J.S.A. 46:30B-106.[10] Unbeknownst to the decedent's widow, she stood to inherit property valued at $50,000. Id. at 1259-60. A company contacted her to assist her in recovering the money for a fifty-percent recovery fee. Id. at 1260. When the widow recovered the property through other means, the company filed suit, seeking enforcement of the agreement. Ibid. On appeal, the widow argued that the agreement violated Washington Revised Code 63.29.350 and was thus void as against public policy. Id. at 1265. The Washington Supreme Court concluded that the statute was inapplicable because the property had not been paid, reported, or delivered to the state as abandoned property. Ibid.
The final case of note is In re Taylor, 216 B.R. 515 (Bankr.E.D.Pa.1998). The issue in Taylor was whether a company was entitled to enforce an agreement with the debtor to find unclaimed bankruptcy funds pursuant to which the company charged a fee equal to fifty percent of the funds. Id. at 517. One argument proffered by the company was that the agreement was analogous to enforceable heir-hunter contracts. Id. at 526-27. Because Oklahoma law governed the contract, the court referenced Oklahoma Statute title 60, § 674.1 (Oklahoma's version of *621 N.J.S.A. 46:30B-106)[11] and the twenty-five-percent limit on fees in that statute. Id. at 527. The court also examined relevant Pennsylvania law[12] but ultimately concluded that these laws were not directly applicable. Ibid. Nonetheless, the court reduced the fee to twenty-five percent pursuant to Oklahoma law and then further reduced the fee to ten percent pursuant to Pennsylvania law. Id. at 528-29.
No reported decision has actually applied any state's version of Section 25 of the 1995 Uniform Act or § 35 of the 1981 Uniform Act to an agreement to recover property.[13] Even if there were such cases, the third sentence of N.J.S.A. 46:30B-106 is unique to New Jersey, in that it authorizes execution of agreements to recover property up until that property is presumed abandoned.
Because the Legislature chose to authorize and regulate contracts, the threshold issue before the General Equity judge was whether the agreements were valid, that is, whether they complied with the requirements of the statute. Both agreements were executed long before the property was presumed abandoned triggering application of the third sentence of N.J.S.A. 46:30B-106. The agreed compensation in both agreements was thirty-five percent of the value of the property, and both agreements were in writing. N.J.S.A. 46:30B-106. The agreements were signed by Zanolini and Anderson, respectively. The Zanolini agreement set forth the nature and value of the property, a cash fund in the amount of $165,400.59. The Anderson agreement did so as well, indicating the fund was worth $61,597.89. Both agreements estimated that legal fees and costs would be around $1000, which would be deducted from the recovered funds before Global's fee was deducted. The Anderson agreement advised that the "[e]stimated net funds to be paid to client are approximately $40,038.63." The Zanolini contract had no such provision, although it is clearly required by the statute. See N.J.S.A. 46:30B-106 ("the value of the apparent owner's share after the fee or compensation has been deducted" shall be clearly set forth in the agreement). The Anderson agreement is certainly a valid agreement under the terms of the statute. The issue is whether the Zanolini agreement is valid.
The requirement that the contract must state the net recovery to the apparent owner is found in the 1989 and 1995 Uniform Acts. Thus, we must construe and apply that requirement "to effectuate its general purpose to make uniform the law with respect to the subject of this law among states enacting it." N.J.S.A. 46:30B-2. There can be no doubt about the meaning of the language employed in *622 requiring a stated value of the owner's share after deduction of the fee. This leads us inexorably to the conclusion that the Zanolini contract is simply not valid under the plain terms of the statute. As a result, we are satisfied that the result reached by the General Equity judge with respect to the Zanolini contract was correct and is affirmed, although for reasons other than those expressed by the judge.[14]
Having concluded that the Anderson contract was a valid agreement "to locate, deliver, recover, or assist in the recovery of property," N.J.S.A. 46:30B-106, we must now determine whether the judge erred in refusing to enforce it. We begin with his concern that the amount of compensation was "incredible" and "outrageous." Clearly, the Legislature did not consider a fee of thirty-five percent to be per se "excessive or unjust." Our Rules of Court expressly authorize attorneys to charge contingent fees of one-third the amount recovered as long as the client is advised that the attorney can be retained on an hourly fee basis. R. 1:21-7. Sometimes, a great deal of work may be required to recover a modest amount and other times a modest amount of work results in a large recovery, yet the attorney's contingency fee is not reduced in the latter case simply because the time devoted to the matter was small. Nor should the fee governed by N.J.S.A. 46:30B-106 be reduced simply because the amount of work effort expended was rather light,[15] especially where the owner of the property did not assert that the agreement was based on "an excessive or unjust consideration." N.J.S.A. 46:30B-106.
We find no factual basis in the record that would permit a conclusion that the thirty-five-percent fee was "excessive or unjust." Ibid. That leaves only the issue of whether there is anything improper about deducting "legal expenses and costs" from the gross amount and computing the compensation on the net recovery. We believe that there is. Global is in the business of recovering unclaimed and abandoned property for its clients. Like any business, it incurs hard and soft costs that affect its profitability. The statute does not expressly permit deduction of legal expenses and costs from the gross recovery. We are satisfied that the omission was not accidental. There is certainly potential for great abuse. For example, a company in this business might shift a significant amount of work to an outside attorney that could easily be done in-house, permitting the company to reduce its soft costs and making the contract more profitable than it would be if it were limited to thirty-five percent of gross, all the while diminishing the total recovery to the owner of the unclaimed or abandoned property. The legal expenses and costs incurred with respect to Anderson's contract were concededly small: $770 in fees and $94.50 in costs at the time of trial. Deducting them from the gross recovery is nonetheless improper.
The last issue on appeal is whether the General Equity judge erred in concluding that the agreements were unenforceable adhesion contracts. Global first notes that this issue was never raised by any party and was only raised for the first time in the trial court's opinion. Substantively, *623 Global argues that the agreements were not standard forms and Zanolini and Anderson "were not compelled in any manner to sign" the contracts. Global essentially asserts that Zanolini and Anderson were free to walk away with knowledge of their entitlement to the property but it was they who chose to have Global do all the work. Global avers that there was no evidence of economic compulsion and Zanolini and Anderson were "satisfied with the terms and conditions" of the contracts. Global also notes that Zanolini was represented by counsel.
Adhesion contracts are "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the `adhering' party to negotiate except perhaps for a few particulars." Rudbart, supra, 127 N.J. at 353, 605 A.2d 681 (citations omitted). Determining that an agreement is an adhesion contract, however, does not render the agreement unenforceable per se. Id. at 354, 605 A.2d 681. Rather, courts must examine several factors to determine if the agreement is enforceable: "the form of the document; the subject matter of the contract; the parties' relative bargaining positions; the degree of economic compulsion motivating the `adhering' party; and the public interests affected by the contract." Id. at 356, 605 A.2d 681.
Under the first factor, the two agreements are one-page typed agreements that are clearly not identical to each other, even though they were prepared by Global within a three-week period. Further, the Zanolini agreement has a handwritten change to a term. This factor militates in favor of Global's position.
The subject matter of the contract was services to recover unclaimed funds. This is an area in which Global had significant experience in many states, and thus knew or should have known the services necessary to assist Zanolini and Anderson, expertise that neither Zanolini nor Anderson possessed. This factor does not favor Global's position.
The relative bargaining positions of the parties is equal. On the one hand, Global is engaged in the business of assisting individuals with recovering funds deposited with governmental entities, including the Trust Fund Unit. Global is thus an experienced and sophisticated party in these matters that enjoys a strong bargaining position. On the other hand, Global faced competition from similar companies and from every attorney in New Jersey, giving Zanolini and Anderson a strong bargaining position. Zanolini's bargaining position was further enhanced by the fact that she was aware of her entitlement to the funds before Global even contacted her, while Anderson only became aware of his entitlement when Global contacted him and sent him the contract. Further, neither party contested the fees, Zanolini had her attorney review the fee, Anderson read the contract, and both individuals understood what Global's fee would be before signing the agreement or at least said that the agreement was fair. The equality of bargaining power favors Global's position that these agreements were enforceable.
Under the fourth factor, there is not much evidence indicating the exertion of economic pressure by Global other than its persistence in pursuing Zanolini and Anderson. They were both free to hire a different company, retain a lawyer, or proceed pro se. Global had no control over the funds, and thus Zanolini and Anderson really had the power to dictate terms. The fourth factor weighs in favor of Global.
The public interests affected by the contracts are important. As Global notes, the *624 public has an interest in allowing companies to assist individuals in recovering property to which they are entitled but of which they might not be aware or might be reluctant to proceed without assistance from others. Invalidation of the agreements could have the potential to chill efforts on the part of companies like Global from seeking to assist individuals in New Jersey and elsewhere. Certainly, the public also has an interest in ensuring that companies do not charge excessive fees for such services, but that public interest is protected by N.J.S.A. 46:30B-106. This factor appears to weigh in favor of Global. We are thus satisfied that the judge erred in concluding that these agreements were unenforceable contracts of adhesion.
To summarize, the Zanolini contract was not valid under the terms of N.J.S.A. 46:30B-106 because it did not state the net Jrecovery to Zanolini. Thus, the portion of the judgment relating to Zanolini is affirmed. The Anderson contract was valid under N.J.S.A. 46:30B-106, the amount of the compensation was neither unjust nor excessive, and the contract was not an unenforceable contract of adhesion. However, Global is not entitled to deduct legal expenses and costs from the gross recovery before calculating its fee. Thus, the portion of the judgment relating to Anderson is reversed and remanded to the General Equity judge for calculation of the thirty-five-percent fee to which Global is entitled under its contract and entry of an amended judgment.
Affirmed in part and reversed and remanded in part.
NOTES
[1] The transcript of the judge's decision is interrupted repeatedly with parenthetical indications that the tape was "indiscernible." Nonetheless, the general thrust of the decision is discernable.
[2] http://www.nccusl.org/Update/uniformact_summaries/uniformacts-s-uupa1995.asp.
[3] These twenty-three states are Alaska, Colorado, Florida, Georgia, Idaho, Iowa, Maryland, Michigan, Minnesota, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Washington, Wisconsin, and Wyoming. Unif. Unclaimed Prop. Act, Table of Jurisdictions Wherein Act Has Been Adopted, 8C U.L.A. 43 (1981) (Pocket Part).
[4] These fourteen states are Alabama, Arizona, Arkansas, Hawaii, Indiana, Kansas, Louisiana, Maine, Montana, Nevada, New Mexico, North Carolina, Vermont, and West Virginia. Id. at 87, 17 (Pocket Part).
[5] The four that have adopted the 1954 and 1966 Acts are Illinois, Mississippi, Missouri, and Nebraska. The remaining nine states that have not adopted any of the acts are California, Connecticut, Delaware, Kentucky, Massachusetts, New York, Ohio, Pennsylvania, and Texas.
[6] An electronic copy of the 1998 Final Report is available at http://www.lawrev.state.nj.us/ rpts/unclaimed.pdf.
[7] These thirty-seven statutes, in alphabetical order by jurisdiction, are: Ala.Code § 35-12-93 (2004); Alaska Stat. § 34.45.700 (2002); Ariz.Rev.Stat. Ann. § 44-327 (2000); Ark.Code Ann. § 18-28-225 (1999); Colo.Rev.Stat. § 38-13-128 (2009); D.C.Code § 41-137 (1981) (formerly D.C.Code § 42-237); Fla. Stat. § 717.1381 (2005); Ga.Code Ann. § 44-12-224 (1990); Haw.Rev.Stat. § 523A-25 (2008); Idaho Code Ann. § 14-536 (1983); Ind.Code § 32-34-1-46 (2002); Iowa Code § 556.11(10) (2003); Kan. Stat. Ann. § 58-3968 (2000); La.Rev.Stat. Ann. § 9:177 (1997); Me.Rev.Stat. Ann. tit. 33, § 1976 (2009); Md.Code Ann., Com. Law § 17-325 (1991); Mich.Comp. Laws § 567.256 (1995); Minn.Stat. 345.515 (2000); Mont.Code Ann. § 70-9-825 (1997); Nev.Rev.Stat. § 120A.740 (2007); N.H.Rev.Stat. Ann. § 471-C:39 (1996); N.J.S.A. 46:30B-106; N.M. Stat. § 7-8A-25 (2006); N.C. Gen.Stat. § 116B-78 (2009); N.D. Cent.Code § 47-30.1-36 (1985); Okla. Stat. tit. 60, § 674.1 (2010); R.I. Gen. Laws § 33-21.1-35 (1986); S.C.Code Ann. § 27-18-360 (1988); S.D. Codified Laws § 43-41B-36 (1994); Tenn.Code Ann. 66-29-137 (1997); Utah Code Ann. § 67-4a-705 (1995); Vt. Stat. Ann. tit. 27, § 1265 (2003); Va.Code Ann. § 55-210.27:1 (1988); V.I.Code Ann. tit. 28, § 676 (2008); Wash. Rev.Code § 63.29.350 (2010); Wis. Stat. § 177.35 (2001); and Wyo. Stat. Ann. § 34-24-136 (1994).
[8] In a fourth reported case from Vermont, the plaintiff, an attorney, requested certain financial records from the Treasurer of the State of Vermont. Sawyer v. Spaulding, 184 Vt. 545, 955 A.2d 532, 532-33 (2008). The plaintiff owned a business that located and recovered unclaimed assets. Id. at 533. After the Treasurer denied the plaintiff's request, the plaintiff appealed the Treasurer's decision. Ibid. Before the Vermont Supreme Court, the Treasurer advanced several arguments, including a public-policy argument based on Vt. Stat. Ann. tit. 27, § 1265 (2003), Vermont's analogue to N.J.S.A. 46:30B-106. Sawyer, supra, 955 A.2d at 536. The Vermont Supreme Court, finding the statute inapplicable, dismissed the Treasurer's argument without substantive interpretation of the statute. Id. at 536-37.
[9] Two other cases citing N.J.S.A. 46:30B-106 are Twiss, supra, 124 N.J. 461, 591 A.2d 913, and Carton v. Choice Point, 450 F.Supp.2d 489 (D.N.J.2006), vacated in part on other grounds, 482 F.Supp.2d 533 (D.N.J.2007). In Twiss, Justice Stein stated in his dissenting opinion that the Legislature adopted the safeguards of N.J.S.A. 46:30B-106 "in order to regulate, not prohibit, the business of heir hunting." Twiss, supra, 124 N.J. at 476-77, 591 A.2d 913 (Stein, J., dissenting). The Court did not otherwise address N.J.S.A. 46:30B-106. In Carton, supra, 450 F.Supp.2d at 498-500, the court dismissed the plaintiff's claim predicated on N.J.S.A. 46:30B-106 after finding the statute inapplicable because (1) it did not create a private cause of action against companies that charge a fee for locating lost property and (2) the property at issue had not been reported abandoned to the state as required by the statute.
[10] The version of Washington Revised Code § 63.29.350 (1983) in force at the time provided:

It is unlawful for any person to seek or receive from any person or contract with any person for any fee or compensation for locating or purporting to locate any property which he knows has been reported or paid or delivered to the department of revenue pursuant to this chapter in excess of five percent of the value thereof returned to such owner. Any person violating this section is guilty of a misdemeanor and shall be fined not less than the amount of the fee or charge he has sought or received or contracted for, and not more than ten times such amount, or imprisoned for not more than thirty days, or both.
The statute was subsequently amended on June 10, 2010, to include certain funds held by counties and a new subsection (2), which addresses public policy concerns in the context of Washington's consumer protection act. 2010 Wash. Sess. Laws c. 29, § 2.
[11] Oklahoma Statute title 60, § 674.1, provides:

A. No person who:
1. informs a potential claimant of any unclaimed funds or other property, tangible or intangible, held pursuant to the Uniform Disposition of Unclaimed Property Act that such claimant may be entitled to claim such unclaimed property; or
2. files a claim for any funds or other property, tangible or intangible, on behalf of a claimant of such funds or property, shall contract for or receive from the claimant, for services, an amount that exceeds twenty-five percent (25%) of the value of the funds or property recovered.
[12] Pennsylvania has not adopted any of the uniform acts. See supra, n. 4.
[13] The comment to § 35 of the 1981 Uniform Act indicates that § 35 was not based on a provision in any prior uniform act. Unif. Unclaimed Prop. Act, supra, 8C U.L.A. at 273. Thus, it appears that neither the 1954 Uniform Act nor the 1966 Uniform Act contained a provision governing agreements to locate property.
[14] There has been no cross-appeal from the amount of costs awarded to Global for the work it did pursuant to the Zanolini contract. As a consequence, we have no occasion to consider whether Global had a right to recover the reasonable value of its services.
[15] Parenthetically, N.J.S.A. 46:30B-106 clearly applies to agreements between lawyers and their clients that fall within the subject matter of the statute. Unlike Section 25 of the 1995 Uniform Act, our statute has no exception for attorneys.